## TILLMAN *v.* STATE.

### Opinion delivered March 30, 1914.

1. HOMICIDE—CIRCUMSTANTIAL EVIDENCE—SUFFICIENCY.—Where the body of deceased was found in an old well, although there was no direct evidence as to the identity of the murderer, the evidence introduced held sufficient to warrant the jury in reaching the conclusion that the deceased was murdered by the defendant, and that he secreted her body in the old well. (Page 244.)

2. HOMICIDE—PLACE OF CRIME—VENUE—CIRCUMSTANCES.—It is sufficient to warrant a verdict of guilty of murder, although the State does not undertake to locate the precise spot where the murder was committed, where the circumstances warrant the finding that the defendant committed the murder in the vicinity of a well, in which the body was found, which was in the county in which the charge is laid. (Page 244.)

3. EVIDENCE—PHOTOGRAPHS.—In a trial for murder, where the deceased and the alleged scene of the crime have been fully described to the jury, it is not error to admit in evidence photographs of the deceased and the place where her body was found, when the State was undertaking to prove that she was murdered. (Page 244.)

4. HOMICIDE—PROOF OF GUILT OF THIRD PARTY—HEARSAY.—It is competent for the defendant in a trial for murder, in order to show his innocence, to introduce proof tending to show that the crime was committed by some other person, but declarations or confessions of guilt by third parties fall within the rule against hearsay testimony and are not admissible. (Page 246.)

5. EVIDENCE—HOMICIDE—EVIDENCE OF GUILT OF THIRD PERSON—HOW ADMITTED.—In a trial for murder, defendant testified to certain relations between deceased and one B., in an effort to show that B. was guilty of the crime. B. testified that defendant's testimony was untrue. The court then permitted the defendant to introduce witnesses contradicting B.; *held*, it was proper for the court to limit the purpose for which this testimony was admitted, to impeaching testimony only, and not as substantive testimony of B.'s acts. (Page 249.)

6. HOMICIDE—EVIDENCE OF ACTS OF THIRD PARTIES—REMOTENESS.—In a trial for the murder of deceased, who was a female, evidence that one F. had had sexual intercourse with her two years before the crime with which defendant was charged, was inadmissible, being too remoté. (Page 249.)

7. INSTRUCTIONS—SINGLING OUT CIRCUMSTANCE—HARMLESS ERROR.—While the practice of framing instructions so as to single out a single circumstance in a case is not commendable, yet it will not be held to be prejudicial error, where the court, in the whole charge, directed the jury to consider all the facts and circumstances proved in the case. (Page 251.)

8. TRIAL—ARGUMENT OF COUNSEL—ERROR.—Improper argument of the prosecuting attorney that defendant, in a homicide case, seduced deceased and murdered her, held not prejudicial, when followed by an admonition from the court removing any prejudice. (Page 252.)

Appeal from Logan Circuit Court, Southern District; *Jeptha H. Evans,* Judge; affirmed.

*W. E. Atkinson* and *Robert J. White,* for appellant.
1. The photographs were not admissible in evidence. 91 Ark. 179; 69 N. E. 216; 9 Enc. of Ev. 780.
2. The exclusion of the testimony as to the lack of virtue of deceased was erroneous and prejudicial. Any

testimony tending to show that some other person may have committed the crime is admissible. 100 Ark. 301; 140 S. W. 13; Wharton on Homicide (2 ed.), § 602; 21 A. & E. Enc. 229; 58 S. W. 1018; 48 *Id.* 980.

3. The evidence tending to show Bolen's connection with deceased and his motive for the crime were admissible. 113 S. W. 897; 6 ·Enc of Ev. 751; 83 Tenn. 604; 39 La. Ann. 921; 77 Ky. 106; 2 Wash. 381; 7 Pac. 872.

4. There were errors in the instructions. They were inconsistent. The court should not single out and stress any particular fact. 59 S. W. 1096; 77 Ark. 418.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. The evidence is conflicting but is of such substantial nature as to support the verdict. 109 Ark. 130; *Ib.* 199.

2. The photographs were properly admitted. 94 Ark. 65.

3. Testimony as to chastity in 1910 was properly excluded. Admissions of guilt by a third party are hearsay. 2 So. 764; 33 *Id.* 893; 11 *Id.* 814-825; 32 Ark. 539-549; 100 *Id.* 301; 14 Cent. Dig., Cr. Law, § 981.

4. There is no error in the instructions. The exceptions are *en masse* and general. 109 Ark. 138; 94 Ark. 68.

5. The remarks of the prosecuting attorney were not prejudicial. 109 Ark. 138. The court properly admonished the jury as to these remarks.

McCULLOCH, C. J. The defendant, Arthur Tillman, appeals from a judgment of conviction for the crime of murder in the first degree, alleged to have been committed on March 10, 1913, by killing Amanda Stephens, a young woman about nineteen years of age.

Defendant and deceased were reared together in the same community in Delaware Township, Logan County, Arkansas. It was a thickly settled community around a postoffice or country village called Delaware, or Dela-

ware Hall. They had known each other from childhood and were on intimate terms up to the time of the disappearance and death of deceased. The girl resided with her parents on a public road a mile or so northeast of the store and postoffice. Defendant was twenty-two years old at the time of the death of the girl, and resided with his parents about a mile southwest of the postoffice. Amanda Stephens disappeared from the home of her parents and from the community on Monday, March 10, 1913, and was last seen during the afternoon of that day at the house of a neighbor, where she made some statements containing hints or suggestions that she was going to leave the community. Her body was found in an old well on a small farm adjoining that of defendant's parents. There was a bullet hole in her head, entering in front and on top of the head, and ranging downward toward the base of the brain; and there were a few minor scratches on her body, not indicating any violence but rather wounds inflicted on the body in placing it in the well. A heavy rock was attached to her neck by a piece of telephone wire, and the rock curbing around the well was thrown into the well over her body, completely covering it and holding it down to the bottom of the well. The well was covered over with plank, scantlings and sticks, which were held down by rocks. The well was near an old abandoned house and was not a great ways from the home of defendant's parents. It was in view from another house on the same farm, which was unoccupied on the day or night the murder is alleged to have been committed, but was occupied by a man and his wife when the body was found.

There is no direct evidence as to the identity of the girl's murderer, but the State relies upon many circumstances tending to connect defendant with it.

The girl was unmarried, and a *post mortem* examination disclosed the fact that she was about four or five months advanced in pregnancy. There is abundant testimony that defendant had been keeping company with her and had been frequently having sexual intercourse

with her for several months before her death. This the defendant did not deny, but, on the contrary, admitted it from the witness stand. There was a pine thicket about a mile north of the postoffice, commonly designated in the neighborhood as the "Pines," and deceased and defendant resorted to that place for sexual intercourse. They were seen together there during the forenoon of the day that deceased disappeared. On Sunday, the day before the killing, defendant went to a physician in the neighborhood, and, according to evidence adduced by the prosecution, stated to the physician that deceased was pregnant as result of their intercourse, and asked the physician to furnish him with some kind of a medicine or remedy that would destroy the unborn child. To this request the physician replied that he had nothing of the sort.

On Monday morning (March 10) defendant mailed a letter at the Delaware postoffice addressed to deceased, asking her to meet him once more, and stating that he had decided to marry her if she wanted him to do so, and requested her to meet him at the "old place" on the following Thursday, saying "we will fix this up," and adding, at the conclusion of the letter, that it would only take about five minutes for the meeting. Defendant admitted in his testimony that he mailed the letter and explained that it was written in reply to a letter he had received the day before from deceased demanding that he should marry her. This letter never reached deceased, but was found in the mail box Monday afternoon after she had left home for the last time. It is shown that shortly after defendant mailed the letter, deceased passed along the road, going up in the direction of the pine thicket already mentioned, and that defendant followed her, and that they went off together in the direction of the thicket. Something less than an hour later he returned down the road, and, being accosted by an acquaintance, stated that he had been to the thicket with deceased for the purpose of having intercourse with her. He asked whether the mail carrier had come along, and

upon seeing the carrier drive up about that time, he started off in a trot toward the postoffice. When he reached there he asked the postmaster to give him the letter which he had mailed that morning, but the postmaster declined to do so on the ground that the mail had already been made up ready for the carrier. Defendant was attending the school at that place, and after leaving the postoffice returned to the schoolhouse.

Late that afternoon, somewhere near sundown, and after the store was closed, defendant left his home and walked up toward a store about half a mile north of his father's residence, and he testified that he went there for the purpose of buying a pencil tablet to use that night in preparation of his lessons. When he got up near the store, according to his statement, he found it was closed, and turned and went back home. Witnesses for the State testified that, in going to the store he traveled an unaccustomed route, and the storekeeper testified that he was near the store at the time in readiness to unlock it to wait on any customer who might apply, and that defendant well knew his habits in that respect. The telephone wire was cut not a great distance from the store and the route pursued by defendant in going up to the store, and the proof shows that this was done late in the afternoon, as the telephone was found about that time to be out of commission. Some of the telephone wire was missing, and the wire corresponded precisely with that with which the rock was attached to deceased's body. In fact, it seems to be treated in the case as an undisputed fact that the wire used in attaching the rock to the body was that which had been taken from the telephone line.

The wound inflicted in deceased's head was by a shot from a 22-caliber pistol or rifle, and it is shown that there was a rifle of that caliber at defendant's home, owned by some of the members of his family.

The next day after the disappearance of deceased, or possibly the day thereafter, her father instituted in-

quiry, having in the meantime found and read the letter which defendant had written to her.

Defendant left the community on Wednesday and went over to Knoxville, a small town on the railroad in the adjoining county, where he had an uncle residing, and perhaps other relatives.

On Wednesday night deceased's father went before a justice of the peace and swore out a warrant against defendant, charging him with the crime of seduction. The officer arrested him at Knoxville at night, but he made his escape from the officer, the evidence tending to show that the officers at that time did not know or realize that a murder had probably been committed, and had no information of it, and were not unwilling for the defendant to make his escape and thus evade the charge of seduction made against him. His illicit relations with deceased had become well known in the community.

Defendant, at the time he was arrested, stated that he would die before he would be taken back to Logan County. He remained at Knoxville several days, not altogether in seclusion, the proof tending to show that he remained most of the time at the house of his relatives, but visited around to some extent. During this time he visited several other young ladies of his acquaintance. On Sunday, March 16, he went back to Logan County to the home of his father, going a circuitous route, avoiding the public roads through the settlement in the vicinity of Delaware and passing through the old field near the well where deceased's body was found the next day. Ambrose Johnson and his wife, who had formerly lived in the house a short distance from the well, returned to the house after the day of the disappearance of deceased, and were living there on the Sunday that defendant returned to the neighborhood. They saw him on the afternoon of that day go to the old well, get down on his hands and knees and look down into the well for a few moments, and then arise and go out of sight behind a thicket, and thence over toward the home of his father. Johnson reported this occurrence the next

day to some of his neighbors, and at his suggestion a searching party went to the well, removed the rubbish and pile of rocks and found the body. Defendant admitted in his testimony that he visited the old well at the time named and gazed down into it as related by the Johnsons, but that he did so because he noticed the appearance of the well was somewhat changed and he feared that some of his father's stock might have fallen in. The testimony of the State in rebuttal, however, tends to show that the stock was not accustomed to range in the field and that the fence was sufficient to keep them out. Defendant went from the old well to his father's house, and then went over a short distance to the house of his uncle, where he spent the night, and, as he says, his father advised him to leave on account of the charge of seduction. He left the next morning, being taken over to the railroad station by some of the members of his family, and went to Memphis, where he stayed awhile, and then went to Fort Smith, Arkansas, where he was arrested by the officers after the body of deceased had been discovered.

Defendant testified in his own behalf and undertook to explain all these circumstances so as to avoid an unfavorable effect.

He admitted, as before stated, his improper relations with the girl, and admitted that he had had intercourse with her about two years before that time. He admitted frequent meetings with her at the "Pines" and at other places. He testified that he met her at the house of a man named Bolden. He said that Bolden also was having intercourse with the girl, and that when she was found to be pregnant, the girl stated to him that either he or Bolden was the father of the child. He stated that when he met the girl at the "Pines" on Monday morning, after he had mailed the letter, she agreed to go away if he and Bolden would furnish her the money, and that he gave her $8, which was all the money he had, and told her to get the balance of the required sum from Bolden.

Bolden testified that he had never had intercourse with the girl, and contradicted defendant about the latter being in bed with the girl at his house when he was present.

Defendant explained his flight from the community by saying that he had heard of the charge of seduction and had been advised by his father to leave, and that he supposed the girl had left the community pursuant to their agreement at the pine thicket on Monday, and had no knowledge that she was dead.

Defendant also introduced members of his family who were at home on Monday night, March 10, the time that it is claimed the girl was murdered, who testified that defendant remained at home that night.

These explanations of the defendant addressed themselves to the jury in passing upon the weight of the incriminating circumstances against him.

The evidence was sufficient, we think, to warrant the jury in reaching the conclusion that the deceased was murdered by the defendant and that he secreted her body in the old well, where it was later found by the search-ing party.

The State has not undertaken to locate the precise spot where the murder was committed, but it was evidently done in the vicinity of the old well or the house which was nearby. It is sufficient that the circumstances warranted the finding that the defendant committed the murder in that vicinity, which was in the county in which the charge is laid.

Learned counsel for defendant have presented a number of assignments of error as grounds for reversal, and we will consider such of them as we deem of sufficient importance to require notice.

In the first place, it is said that the court erred in permitting the State to introduce several photographs of the girl, the old well, and the vacant house nearby, some of them represented separately in the photographs and some of the scenes grouped together in one picture. The court overruled the objection on the ground that the

defendant had consented to the introduction of the photographs; but it is contended by counsel that at the time the first photographs were admitted in evidence they did not know that others, now urged as objectionable, were among the lot, and that they objected to them as soon as they were introduced.

We are really unable to see what bearing those photographs could have had upon the case, or how their introduction could have operated to defendant's prejudice. The photographs all represented scenes that were described to the jury and were but pictures of the girl and the place where her body was found and where, according to the State's theory, she was murdered. The girl was fully described to the jury, her age and size, and also the condition of the old well, both at the time of the murder and at the time of the discovery of the body. Those photographs added nothing to the mental picture drawn before the jury, and we can not see how they aided in any manner the State's case or prejudiced the defendant's side of it.

It is urged in oral argument that the picture of the girl, showing her youth and apparent immaturity, might have inflamed the minds of the jury to a high pitch, and induced them to return a verdict of guilty against the defendant on account of the prejudice against him thus excited. But we must indulge the presumption that the jurors were men of fair intelligence, and that their feelings and prejudices were not played upon by the mere exhibition of the photographs. Of course, if the photographs had not been authenticated, and were introduced to afford a description of some place about which the testimony substantially conflicted, then it could have been said that prejudice resulted. But we are unwilling to say that the introduction could or might have had any influence at all upon the jury or tended in any degree to influence them in making up their verdict.

There is an assignment concerning the refusal of the court to permit a witness to testify that defendant told him that he was going to Fort Smtih when he

left the community on Wednesday after the disappearance of the girl.

The record shows that the court at first refused to permit the witness to testify to that conversation, because it was a different time from that as to which the witness had testified in chief, but at last the witness was permitted to testify concerning the statement of the defendant to him, and the court overruled a motion of the State to exclude it. So there is nothing in that assignment of error which needs further consideration.

Counsel for defendant, in conducting the trial of the case, seem to have had the theory that G. B. Stephens, the father of the girl, may have killed her, on account of having ascertained her condition of pregnancy and her relation with defendant and other men in the neighborhood.

Stephens was introduced as a witness by the State, but testified to no material disputed facts. His testimony only related to the age of the girl and her disappearance, and the finding of the letter from defendant in the mail box, all of which were matters about which there was no dispute whatever.

On cross examination he was asked about certain statements which he is alleged to have made after the disappearance of the girl and before her body was found. Among other things he was asked if he had not stated to certain persons on Thursday preceding the finding of the body on Monday that "it was no use to look for the girl north of the military road, but that when found she would be south of the road, with a bullet hole in her head and a rock tied around her neck, and in a well near Tillman's."

Stephens denied that he had made any such statement, and defendant offered testimony of parties to the effect that he had made the statement. This was for the purpose of showing that before the body was found Stephens knew where the body was and the condition it was in, and must have participated in the killing or had a guilty knowledge thereof. The testimony was offered,

not merely for the purpose of contradiction, but as substantive proof that the crime was committed by Stephens and not by defendant.

Considering the statements as merely proof in impeachment of the witness, no prejudice could have resulted from the exclusion, because the testimony of Stephens was without any substantive force, and defendant was not injured by being refused permission to break it down. The test of competency is whether or not defendant was entitled to prove the fact as a part of his case, independently of the denial of the witness. *McAlister* v. *State,* 99 Ark. 604. It was, of course, competent for the defendant, in order to show that he was not guilty of the murder, to introduce proof tending to show that the crime was committed by some other person. But declarations or confessions of guilt by third parties fall within the rule against hearsay testimony and are not admissible. Mr. Wigmore so states the rule, and collates numerous authorities sustaining it. 2 Wigmore on Evidence, § 1476. See also Underhill, Criminal Ev., § 145; 1 Wharton's Criminal Evidence (10 ed.), § 225; 4 Chamberlayne, Modern Law of Evidence, § 2703; *Snow.*v. *State,* 58 Ala. 372; *People* v. *Hall,* 94 Cal. 595, and *State* v. *Evans,* 55 Mo. 460.

Mr. Underhill, at the place cited above, states the law as follows:

"The prisoner may, of course, disprove his guilt by proving the guilt of some other person. But he can not do that by introducing the extra-judicial confession or declaration of that person that he intended to commit, or that he had committed, the crime. The extrajudicial declaration is never conclusive upon the declarant. He may, if he be subsequently indicted because of this so-called confession, demonstrate its falsity and absolve himself. To receive such statements as exculpatory proof would be to open wide the door for the practice of fraud whereby the acquittal of the real criminal would be assured."

It is insisted, however, that the testimony was competent upon the principle involved in the rule that proof of extraneous facts, reached through an inadmissible confession of the accused, may be received in evidence. 2 Wharton's Criminal Evidence, § 678. The rule is stated in Greenleaf as follows:

"Where, in consequence of the information obtained from the prisoner, the property stolen, or the instrument of the crime, or the bloody clothes of the person murdered, or any other material fact, is discovered, it is competent to show that such discovery was made conformably to the information given by the prisoner. The statement as to his knowledge of the place where the property or other evidence was to be found, being thus confirmed by the fact, is proved to be true, and not to have been fabricated in consequence of any inducement." 1 Greenleaf on Evidence, § 231.

That rule was recognized and stated by Chief Justice COCKRILL, speaking for this court, in *Yates* v. *State*, 47 Ark. 172, as follows:

"When statements are made by the accused that lead to the discovery of the stolen property, then the rule is that it is admissible to show that the property had been traced by means of information received from the accused; and all that was said by the accused in conveying the information, which is directly connected with or explanatory of the discovery, is also admissible. The statement as to his knowledge where the stolen property was to be found being thus confirmed by the fact of finding, is proved to be true and not to be fabricated in consequence of the improper means employed to obtain the confession."

The basis of the rule is that the discovery of the facts as disclosed in the confession gives confirmation to them, apart from the otherwise inadmissible confession, and renders it admissible, and the question of admissibility of purely hearsay testimony is not involved in its application.

The alleged statements of Stephens did not reach a higher standard of value as evidence than admissions of guilt, and as such were inadmissible under the rule established by the authorities. They amounted to no more than an admission that he knew where the body was, and therefore had some knowledge of the commission of the crime. The body was discovered, not in consequence of his admission, but as a result of witness Ambrose Johnson becoming suspicious on account of appellant's conduct at the old well. The alleged statement of Stephens stands alone as an admission, unaccompanied by any act susceptible of proof. The fact that the body was afterward found at the place indicated in his alleged confession does not change the character of the statement as hearsay testimony, nor give it any additional force concerning the guilt or innocence of the defendant.

We are of the opinion, therefore, that the court did not err in excluding the testimony.

This disposes also of the assignment concerning proof of statements alleged to have been made by Bolden as to his alleged criminal intimacy with the deceased girl. Effort was made to connect Bolden with the commission of the crime by showing that he had been having sexual intercourse with her frequently, that he, too, had been charged by the girl with being the father of her unborn child and that other circumstances pointed to his guilt of the crime of murder. Defendant testified that he had intercourse with the girl at Bolden's house upon the latter's invitation, and that on one occasion he got out of the bed and Bolden took his place with the girl. Bolden was introduced by the State in rebuttal and testified that he had never had intercourse with the girl and that the defendant's testimony was not true. The court permitted defendant's counsel to ask him whether he had made statements to other parties admitting his improper relations with the girl, and also permitted defendant to introduce witnesses to contradict Bolden by testifying that he had made these statements to them. This was admitted purely as impeaching testimony, but not as

substantive testimony of the fact of Bolden having inter-course with the girl.

This was the correct view of the law, and the court did not err in thus limiting the purpose for which the testimony might be considered.

The defendant was attempting to present to the jury the theory that the crime was committed by Bolden and that his illicit relations with the girl and the probability of having begotten the child afforded motive for him to commit the crime.

It was competent to prove any fact which tended to prove Bolden's guilt of the crime, but not to prove statements which amounted to confessions of guilt.

It is urged that the court erred in refusing to permit defendant to prove that one Fisher and other men had had intercourse with the girl about two years before.

It developed in the testimony that about two years before the death of the girl she had become pregnant and prematurely gave birth to a child. Defendant volunteered the statement, when he went on the stand, that he had had intercourse with her himself about that time on the suggestion of two other young men in the neighborhood, who stated to him that they had been having intercourse with her and that they had seen one Fisher having intercourse with her out under a tree. Defendant then offered to prove by witnesses acts of intercourse between the girl and Fisher prior to the time of the first pregnancy of deceased; but the court refused to admit the testimony, doubtless upon the theory that it was too remote from the killing to throw any light upon that issue.

We think the court was entirely correct in its ruling in that respect, for the question as to who was having sexual intercourse with her two years prior to the killing was too remote a field to enter upon. Defendant could not open up the field of inquiry by his own voluntary statement that he had had intercourse with her himself at that time. The court did not shut out any proof

of improper relations between the girl and any one at a period of time not remote from the date of her death.

Error of the court is assigned in giving the thirteenth instruction, which it is alleged called to the attention of the jury for their consideration the motive of the defendant for the killing by reason of his illicit relations with the girl. The instruction did not, in terms, attempt to instruct the jury upon the weight of this circumstance, but it is argued that singling it out necessarily gave it undue weight and that it was improper for the court to do so. Counsel rely upon the decision of this court in *Ince* v. *State*, 77 Ark. 418, where it was decided that the court properly refused an instruction which singled out the motive as one of the facts of the case and presented it specially to the jury for their consideration. They also rely upon the recent case of *Scott* v. *State*, 159 S. W. 1095.

In the case of *Hogue* v. *State*, 93 Ark. 316, we discussed this question at length, and, after reaffirming the doctrine of the Ince case, that the practice of framing separate instructions in such manner as to single them out was not commendable and that the court would not be reversed for refusing to give such an instruction, we laid down the further rule that, while the giving of such an instruction was not a practice to be commended, yet it did not constitute prejudicial error where the court, in the whole charge, directs the jury to consider all the facts and circumstances proved in the case.

There is nothing in the opinion in the Scott case, when considered as a whole, which conflicts with that view.

The charge of the court given in the present case, when taken as a whole, fairly submit to the jury the question of the guilt or innocence of the defendant and directed them to consider all the testimony in the case. The court told the jury explicitly that ''whether the circumstances in this case are sufficient to warrant a conviction is a question for the jury, along with the instructions of the court pertaining to the law.''

All the other instructions in the case have been approved in decisions of this court, and further discussion of them is useless.

The last assignment relates to remarks of counsel for the State which it is claimed were erroneous and prejudicial. The record shows that Mr. Cochran, one of the counsel for the State, in his argument made the statement that "he (meaning defendant) was her sweetheart and in that way gained her confidence and seduced and debauched her." Counsel for defendant made an objection on the ground that there was no proof of seduction, and the court replied that that was a question for the jury. Counsel then proceeded with the statement that the defendant, "after seducing and ruining her, the low down scoundrel murdered her and threw her in the well" (at this point being interrupted by the objection of counsel for defendant), and the court said: "That is improper and will be excluded from the jury; they will not consider it."

Now, it is a little uncertain whether the court's ruling related to the whole of the statement; but we are inclined to think that defendant's counsel are correct in their interpretation of the record that the court only excluded the last statement, leaving the first statement unrebuked.

The prosecuting attorney, in his closing argument, made the remark that "if she (referring to Amanda Stephens) was base before Arthur Tillman began with her, why didn't you prove it?" Counsel for defendant arose and stated that they had offered to prove it, but that the court had excluded the proof, and the trial judge remarked in the presence of the jury that he did not recall that such evidence was offered. After the conclusion of the argument the court gave the jury the following additional instruction:

"Gentlemen of the Jury: A few moments ago counsel for the defendant objected to the argument of the prosecuting attorney who has just closed. The objection was to that portion of the argument in which he said

the defendant hadn't offered any testimony tending to show that anybody else had sexual intercourse with Mandy Stephens. Counsel for the defendant said that they had offered that testimony and it had been excluded by the court. I said I could not remember that. The defendant did offer the testimony of Bob Lynn to show that in 1910 at some time he and another party saw Bill Fisher having intercourse with Mandy Stephens. That testimony was objected to by the State and excluded by the court. It is of no consequence at all whether any person had intercourse with her in 1910 or not. If any other testimony was offered on that point I don't recall it. That being the state of the case, and the court having held it inadmissible, I feel certain that no statements were called for on either side in regard to it. There is no evidence to warrant them—at least no legal evidence. In this case it can be of no consequence whether anybody had intercourse with her in 1910, and if the defendant had intercourse with her is only material in showing whether he may or may not have had a motive in taking her life. That is the only reason it is admitted in this case.''

Then followed some further remarks to the jury, admonishing them that they should not treat the trial as a battle of lawyers, but must consider the question of defendant's guilt or innocence entirely upon the evidence adduced in the case.

Now, as to the first objection of counsel, we are of the opinion that, when it is viewed in the light of the evidence, it only referred to the illicit relations which indisputably existed between the defendant and the girl, and not to the technical crime of seduction. The court carefully instructed the jury that proof of that kind was admitted for the sole purpose of showing whether or not defendant had a motive for committing the crime, and when the whole charge of the court is considered together, especially the conclusion, in which he admonished the jury to disregard proof of intercourse with the girl by any person except upon the question of motive for

committing the crime, and to try the case according to the evidence adduced, we are of the opinion that the remarks of counsel were freed of any prejudicial effect.

That Amanda Stephens was murdered by some one can not be disputed. The crime was one of peculiar atrocity, but the identity of the offender depends entirely upon circumstances. It is not incumbent upon us to decide whether or not that question is entirely free from doubt, but we are clearly of the opinion that the evidence is legally sufficient to warrant the jury in finding the defendant guilty of the crime.

The record is a very large one and the testimony is voluminous. Upon the whole, we are of the opinion that the case was fairly presented to the jury and that no prejudicial error appears in the record. Under those circumstances, it becomes our duty to leave the verdict undisturbed, for the defendant has had a fair trial before a jury of his own selection and must expiate the crime of which he has been found guilty.

Judgment affirmed.