FLOYD *v.* STATE.

Opinion delivered March 3, 1930.

*Smith & Blackford,* for appellant.

*Hal L. Norwood,* Attorney General, and *Robert F. Smith,* Assistant, for appellee.

MEHAFFY, J.   Neeley Shaver died about January 18, 1926.  He was embalmed in the usual way and buried at Evening Shade, in Sharp County, Arkansas, and was exhumed in November, 1927, the contents of his stomach, liver and kidneys being sent to Dr. Manglesdorf, state chemist at Little Rock, and he reported finding one and one-half grains of arsenic poison in his stomach and more than ten grains in his other organs, which was enough to cause death.  John Mullen a brother-in-law of the appellant, had a policy of insurance upon Shaver's life for about $11,000.  Shaver lived on Mullen's farm, and was with him for several years, and had farmed Mullen's land a part of the time.  On the day before he died that night John Mullen received word that Shaver was sick, while he was at Minturn, and immediately went to Walnut Ridge and employed Dr. Land to go and wait' upon Shaver, and Mullen went with the doctor to Shaver's house in the afternoon.  Dr. Land examined him, prepared and left a bottle of medicine with the old lady who lived with Shaver, giving her directions, and he and Mullen went back to Walnut Ridge.  Dr. Land found Shaver very sick, run-down and having smothering spells; found that he had been eating hogshead cheese and found that it was in a tin dishpan and not fresh, and the doctor concluded that Shaver had ptomaine poison, but said that it could have been arsenic.  A few hours later, the appellant, Frank Floyd, a tenant on the same farm, went over to the Shaver place to sit up and give medicine.  He testified that he gave the medicine with the help of the others at the house, out of the bottle he found there. He arrived at the Shaver home about six or seven o'clock in the evening.  Shaver died about midnight.  Fredis and Ora Pierce, a son and daughter of Dan Pierce, who died subsequent to Shaver's death, and upon whose life the same John Mullen had a life insurance policy, made to him as a creditor, about which he had had some litigation with the widow and heirs of Dan Pierce, which litigation was compromised, and the widow and heirs of Pierce,

receiving a portion of the proceeds of the policy, as witnesses testified that the appellant came by their house on the evening that Shaver died and showed them a bottle of medicine, similar to the one described by Dr. Land, and that he gave Shaver some medicine out of the bottle which he took over. Their testimony showed that after Shaver died appellant put the bottle with the remaining medicine in it into the stove. That he raised the cap of the stove and put it in, but said nothing at the time. Julia Brogdon, the old lady who lived with Shaver, testified that she helped Frank Floyd give the first dose, and that she knew it was out of the bottle which Dr. Land left with her to be given. Dr. Seal, who had been Shaver's physician, testified that he had given him a Fowler's solution or arsenic for a long time, which was a medicine commonly given for run-down old men, and that a habitual taker of it would leave traces of it in the system. The jury found the defendant guilty of murder in the first degree and fixed his punishment at life imprisonment. Motion for new trial was filed and overruled, and appeal prosecuted to this court.

We do not deem it necessary to set out the testimony in full, but the evidence tends to show that Fredis and Della Pierce saw appellant about seven o'clock, and that at that time he had a little bottle of medicine, about three inches long, reddish looking with a whitish looking sediment at the bottom. That he had this medicine as we were going to Shaver's house. They testified that Frank Floyd gave Shaver a dose when he got over there; that Shaver was suffering pretty badly when they got there. That appellant gave him a dose out of the bottle he took with him, about fifteen minutes after he got there and another dose in about an hour and a half. They also testified that Shaver got worse and did not want to take the second dose, said it was smothering him. Shaver died about twelve o'clock. After he died, Floyd burned the bottle of medicine in the stove. The undisputed evidence shows the finding of arsenic in the body after death.

Dr. Land testified that the medicine he left for Shaver was a reddish brown looking substance with a whitish settling in the bottom of the bottle. The doctor was at Shaver's about four or five o'clock. Julia Brogdon testified about the doctor leaving the bottle of medicine, and that the first dose was given after appellant came and that she knew it was out of the bottle Land left. She did not know what became of the bottle.

Dr. Seal testified that Shaver was addicted to taking Fowler's solution of arsenic, and that the last two years of his life he was very feeble.

Frances Collins testified that Della Pierce wanted her to testify that she saw Floyd with a bottle of medicine.

The appellant testified in his own behalf and denied the statements made by Fredis and Ora Pierce; that he did not see Shaver Sunday, and his testimony as to being elsewhere on Sunday was corroborated by John Holloway and Taylor Mullen. Some witnesses were introduced and testified that Frank Floyd's reputation was good. After both sides had rested the court permitted the State, over the objection of defendant, to recall defendant for further cross-examination.

It is first contended by appellant that the evidence was insufficient to support the verdict, and that it affords mere grounds of suspicion and does not justify a conviction. He contends that there is no substantial proof. The fact that enough arsenic was found in his body to have killed him, together with the testimony of Fredis and Ora Pierce that they saw appellant give Shaver medicine and then burn the bottle with the balance of the medicine, and the other circumstances testified to in the case, were sufficient to carry the case to the jury. The next contention made by appellant is, that the court erred in permitting the State to reopen the case after each side had rested, and in permitting the court stenographer to read from the testimony of appellant at a former trial, for the purpose of impeaching and contradicting him on an im-

material matter. The stenographer was called and the court said: That they could read that part only which related to appellant's testimony for the purpose of impeaching or contradicting. Whether it does or not, that is for the jury to say and to consider in weighing his testimony at this trial. The State then asked the stenographer this question: In Mr. Floyd's testimony given in this trial before, the following question was asked him on cross-examination: "Now, can you figure for us about how many doses you gave him?" and his answer was, "Well, they gave him—Mrs. Brogdon gave him the second capsule after I got there, and then we gave him the other medicine every two hours." Then he was asked, "Well, you gave all the medicine that was given after you got there?" and his answer was, "No, sir." Then he was asked, "Who else gave him some? His answer was, "Well, I don't know, we both gave the medicine to him. He would carry the medicine and I would carry the water." This testimony was competent. This testimony of statements appellant had made before, which tended to contradict his testimony given at this trial, was competent for the purpose of contradicting him.

It is next contended by appellant that the court erred in giving instruction No. 9. Said instruction reads as follows: "I instruct you, gentlemen, that it rarely happens that one person kills another without some motive, such as hatred, fear, hope of gain, etc. The State may prove the motive if it can, and when it does so, the evidence with respect to motive often serves to throw light upon the mental condition of the slayer, with respect to malice. And such evidence may tend to prove express malice referred to in these instructions; but it is not necessary for the State to prove the motive, in order to warrant a conviction. It may happen that there are no external conditions capable of proof of express malice; but the prosecution does not necessarily fail for that reason, for in many cases there is implied malice without that proof, and the implied malice as the word indicates is

malice inferred or implied from all of the facts and circumstances of the death, or when the facts and circumstances of the death show a wicked and abandoned disposition.''

Appellant cites and relies on *Scott* v. *State,* 109 Ark. 391, 159 S. W. 1095. The instruction given in that case, however, was wholly different from the instruction given in this case, and that case does not sustain appellant's contention. The court there told the jury: ''You are instructed that the proof of the presence of a motive, or the absence of a motive, upon the part of the defendant with reference to the killing of his wife has absolutely nothing to do with this case. It is not incumbent upon the State to prove either the presence or the absence of a motive for the killing; and the presence or the absence of a motive has no bearing whatever upon an issue of insanity as a defense to the crime of murder.''

The above instruction was condemned, because it singled out the proof of motive or absence of motive, and told the jury that the presence or absence of motive had absolutely nothing to do with the case; that by doing so undue weight is given to the proof, thus invading the jury's province; that it is error to single out the question of motive for the commission of the crime, and point to it as a proper subject of consideration as an evidence of defendant's guilt, and it is equally erroneous and improper to point to the want of motive as an evidence of his innocence.

In the instant case, the court simply told the jury that the proof of motive often serves to throw light upon the mental condition of the slayer with respect to malice, and that such evidence may tend to prove express malice referred to in these instructions, but it is not necessary for the State to prove the motive in order to warrant a conviction.

The court further said in the case of *Scott* v. *State:* ''The instruction is erroneous in stating that the proof of the presence or absence of a motive on the part of de-

fendant for killing his wife had absolutely nothing to do with the case. It is true it is not incumbent upon the State to prove either the presence or absence of the motive, but the jury had the right to consider such testimony in determining the guilt or innocence of defendant, and the court in the instruction is in error in declaring that the presence or absence of a motive had no bearing whatever upon an issue of insanity as a defense to the crime of murder. The instruction virtually told the jury that they could not consider the proof relative to the presence or absence of a motive for the killing; that that had absolutely nothing to do with the case and no bearing whatever upon an issue of insanity as a defense to the crime charged.'' An examination of the instruction in the instant case will readily show that it is not subject to the objection pointed out in the Scott case.

In the next case cited and relied on by appellant, *Ince* v. *State*, 77 Ark. 418, 88 S. W. 818, the court simply held that the lower court did not commit error in refusing an instruction which told the jury that, if no motive was shown, it was a circumstance in favor of defendant's innocence to be considered by the jury. The court held that it was improper to tell the jury that the evidence singled out was a circumstance in defendant's favor.

In the case of *Hogue* v. *State*, 93 Ark. 316, 124 S. W. 783, cited and relied on by appellant, the court simply held that the instructions offered in that case were not objectionable, and that a careful consideration of the whole record showed that the defendant had a fair trial. It is true there is a dissenting opinion in that case, and the judge writing the dissenting opinion thought the instruction was wrong, but the court held that it was proper.

The case of *Tillman* v. *State*, 112 Ark. 236, 166 S. W. 582, referred to and relied on by appellant, refers to the other cases above mentioned, and approves the instruction that called attention to motive and affirmed the case. Appellant is correct in stating that, where a prose-

cution and claim for conviction is based solely on circumstantial evidence, it is the duty of the court to give an instruction, as suggested by appellant. But this case does not depend solely on circumstantial evidence; it depends partly on circumstantial evidence and partly on direct evidence.

It is next contended that special counsel, in making the closing argument to the jury, made certain remarks which were prejudicial and called for a reversal of the case. We think any prejudice which might have been created was corrected by the statement of the court.

It is finally contended that the court committed error in the manner in which it passed on the objections, mildly and by stating that counsel had the right to make his conclusion, etc. So far as the record shows, there is nothing in the manner of the court, or in what he said, which could be construed as prejudicial to appellant. The evidence in this case is not very strong. It is sufficient, however, if believed by the jury, to authorize it to find a verdict of guilty. We do not pass on the weight of the evidence nor the credibility of witnesses. This is the province of the jury, and if there is any substantial evidence to support the verdict, this court cannot set it aside on the ground that it is insufficient to support the verdict. We have carefully examined the entire record, and have reached the conclusion that there is substantial evidence to support the verdict, and that the instructions as a whole correctly stated the law to the jury.

The judgment of the circuit court is therefore affirmed.