## STATE v. LANTZER

(No. 2127; February 13, 1940; 99 Pac. (2d) 73)

232

For the appellant, there was a brief and oral argument by *Allen A. Pearson* of Cheyenne.

For the respondent, there was a brief by *Ewing T. Kerr,* Attorney General; *Harold I. Bacheller,* Deputy Attorney General; and *Arthur Kline,* Assistant Attorney General, all of Cheyenne, and oral argument by *Mr. Kerr.*

*Allen A. Pearson* in reply.

KIMBALL, Justice.

Defendant killed his wife, Cecile, at Cheyenne on August 29, 1938. His trial resulted in an unqualified verdict finding him guilty of murder in the first degree, and he appeals from the judgment pronouncing the death sentence.

Defendant and deceased were married about two years before the homicide, and lived at Brush, Colorado. Title to their home and furniture which were only partly paid for was in the wife. Defendant was of good character, industrious and fond of his wife. He was employed in the bridge and building department of the Burlington Railroad. This work took him from home during working days, but he was home each Saturday night and Sunday. In the spring of 1938 he was temporarily put out of work for the railroad by being "laid off" subject to call. Thereafter he worked at whatever odd jobs he could find. In the latter part of June he went to Kansas to work in the wheat fields, and was there employed with a threshing crew on July 6, when a friend in Brush advised him by telephone to come home. Defendant at once returned to Brush where he found that his wife had left home, and was informed that she had appeared publicly in a lewd dance put on by a street carnival company that had showed in Brush during the Fourth of July celebration, and that she had probably left with the company. He was told also that at various times when he had been absent from home, his wife frequently had been guilty of misconduct in associating and drinking with other men. There is no reason for repeating the testimony in regard to these reports. It was admitted as having some bearing on defendant's mental condition. De-

fendant's subsequent conduct, including the fatal shooting, was not influenced by resentment caused by belief that his wife had been guilty of the misconduct which was the subject of the reports. If he believed her guilty, he readily forgave. He testified that "after having heard these things" he was trying to find his wife "to beg her to come home," and this is confirmed by all the testimony in regard to conversations with his wife after he found her.

About the middle of July, defendant learned that his wife had not left Brush with the carnival company, but had gone to Cheyenne. He soon came to Cheyenne where he met her, and at the trial he gave this testimoney in regard to what then took place: "I tried to get her to come back at that very time because I figured on going back to Kansas [to work] on that threshing outfit. * * * I told her there was a lot of talk going on about her at home, and I didn't want to lose the place and the furniture, and I wanted her to come back and stay with me and face everything that was there because I couldn't face it down myself. She told me that she didn't want to right away, that for me to go on back and get a job, and then she would come with me, wherever I was."

After this meeting defendant returned to Brush; went to Kansas where he failed to find work; returned to Brush where he worked for about a week, and then decided to go with a friend to North Park near Walden, Colorado, to work in the hay fields. On the way to Walden he stopped at Cheyenne to see his wife, and had a conversation with her, which he relates thus: "I wanted to know what she wanted to do about everything and I asked her if she would go back home with me when I came back from Walden because I didn't get no job in Kansas. I told her I would be up there about thirty days haying and would have a little money when I came back. She says: 'When you come back by here,

stop, and I will go back to Brush with you.' " This was about August 1.

The job of haying at North Park lasted until about August 27, and on that day defendant, in his friend's car, went to Denver where he bought the gun and ammunition which he later used in the killing. The next day he came to Cheyenne on a bus and about noon met his wife at the home of Mrs. Newton where his wife was staying while employed at a near-by tourist camp. Defendant asked his wife if she would go back to Brush with him, and testified that that was practically all they talked about. The wife said she didn't care about going back to Brush. Defendant told her he couldn't afford to lose the money he had put into the home, and asked her if she wouldn't "assign the contract" to him. She did not agree to do this, but "wouldn't say she wouldn't [and] there wasn't much said about it." Finally defendant pulled out the loaded pistol and pointed it at his wife, saying, "you can't do this to me, or words to that effect." The wife cried, "Stan, put that gun down," and Mrs. Newton and her son came in from an adjoining room, and persuaded defendant to give one of them the pistol from which the cartridges were then removed. The wife left the house, and later defendant left after having the unloaded pistol returned to him. He came back later in the day and again begged his wife to return to him, but she continued to refuse to do so. When he left the Newton home after the last visit he went to the business district of the city and spent the night at a hotel.

On the morning of August 29, carrying the pistol which he had reloaded that morning or the night before, defendant went to the tourist camp where his wife was employed. He asked an attendant where she was, and was directed to the washroom where he found her washing clothes. Their conversation in the washroom was a substantial repetition of what had been

said at previous meetings. The wife continued to refuse to return with him to Brush, and said there wasn't any use talking to her about it because she and her daughter by a former marriage were going away. He testified that he asked her if she cared for him and he believed she said she did; that he knew she didn't say she didn't care for him. He then went to the men's toilet, and his wife continued with her work. When he came out of the toilet she was at the clothes line hanging out clothes she had washed. What then happened defendant tells thus: "I asked her, 'Cec, is there any more use talking to you?' She said 'no.' I asked her if that was the last chance I would have to talk to her, because I had to go home, and I think she said, 'yes.' The next thing I remember of is reaching for this gun and starting to point it." He then fired the fatal shot. The bullet entered the body on the left side of the back and went forward and slightly downward piercing the left lung and tip of the heart.

After the shooting defendant had some thought of running away, but decided to surrender, and approached the camp attendant to whom he handed the pistol stating that he had just shot his wife and requesting that the police be called. The call was made, and in response the sheriff, undersheriff and the city captain of detectives came to the camp, and took defendant into custody. Some one asked defendant if his wife was dead, and the three officers and two other parties who were present testified that defendant said: "I shot to kill," or "I shot her for dead."

The facts leading up to the homicide, as stated above, were shown by the testimony of defendant himself, and left no room for doubt of his guilt, if he was sane. Other evidence need not be stated except as it comes to notice in considering the assignments of error. Defendant was unable to employ counsel but was represented, both at the trial and on the appeal, by an able

and experienced attorney who, serving under appointment by the court, has made the most of a hard case. It is not contended that the evidence on the issue of insanity, the only available defense, was insufficient to support the finding against defendant, or that the instructions submitting the issue were incorrect.

A few hours after defendant was arrested, he made a statement in response to questions asked by the sheriff and the prosecuting attorney. The questions and answers were taken in shorthand and, after being transcribed, read to defendant. At the trial the writing was received in evidence over defendant's objections. It is contended that this was error.

One objection to the writing was that it was not shown that defendant's statements were made voluntarily. The writing shows these preliminary questions and answers:

"Q. Mr. Lantzer, before I ask you any questions, I want to inform you that anything you say may be used against you. You understand that, don't you?

A. Absolutely.

Q. And with the full knowledge that anything you might say may be used against you, you still wish to make this statement? You have no objections, do you?

A. Well, I don't know. I don't know what to think or say or do.

Q. You have no objections to telling us the facts in this case?

A. There is some facts that I wouldn't want to bring up. No characters or anything like that.

Q. Under the law I have to inform you before I take this statement that whatever you say may be used against you. And now I wish to ask you some questions relating to the facts of what occurred this morning. There will be a few short questions. That is agreeable to you, is it?

A. I guess it is.

Q. You are willing to answer these questions? If you don't want to answer them, why, you can refuse. Is that all right?

A. That is absolutely all right."

There was nothing in the writing itself or in the other evidence at the trial to indicate that defendant was induced to speak by threat or promise. The objection on the ground that the statements were not voluntarily made was properly overruled. See Mortimore v. State, 24 Wyo. 452, 161 Pac. 766.

At the trial defendant made specific objection to a part of the writing on the ground that certain of the questions and answers had no bearing on the question of his guilt or innocence and had a tendency to create prejudice against him. This objection was sustained and the questions and answers referred to were struck. It is now contended that some of the other questions and answers are "upon subjects far afield from the question of appellant's alleged crime." The particular parts of the writing that counsel has in mind are not pointed out. In the circumstances, we think all we need say in regard to this contention is that practically all of the statements by defendant were relevant as tending to show or explain his acts, motive, intent or state of mind; and that the few irrelevant statements could not have caused any unfair prejudice against defendant.

The next contention, which seems somewhat inconsistent with the one just noticed, is that the statement shows that it does not contain all that was said. Near the end of the writing it is shown that both Mr. Carroll, sheriff, and Mr. Caldwell, prosecuting attorney, said "that is all," and it is then recited (evidently the language of the stenographer) : "Whereupon, colloquy off the record was had between Mr. Caldwell, Mr. Carroll, and the witness." Thereafter questioning was resumed by the prosecuting attorney thus:

"Q. You have just stated that you once told your wife that you would kill her if she ever left you?

A. Yes, and then I told her I couldn't do anything like that.

Q. You couldn't?

A. Yes.

Q. Where did you tell her you were going to kill her?
A. I imagine it was home there as near as I know.
Q. Several years ago?
A. Well, it is since we have been married. I wouldn't say for sure."

These further questions and answers are the only evidence to show that anything of importance was talked about in what the stenographer referred to as the "colloquy off the record." The sheriff, the stenographer and defendant were witnesses at the trial and none of them was asked what was said at that point. We think we may assume that defendant's objection on this ground was merely technical and that he did not mean to claim that anything of importance was omitted from the stenographer's transcript.

It is contended that the court erred in refusing to give the following instruction requested by defendant:

"You are instructed that the statements of a prisoner are received as evidence of guilt, upon the presumption that a person will not make an untrue statement against his own interest. The evidence of oral statements of guilt is to be received with great caution; for, there, besides the danger of mistake from the misapprehension of witnesses, the misuse of words, the failure of the party to express his own meanings, and the infirmity of memory, it should be recalled that the mind of the prisoner himself is often oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make an untrue statement. Subject to these cautions in receiving and weighing them, it is generally agreed that deliberate statements of guilt are among the most effectual proofs in the law. Their value, however, depends on the supposition that they are deliberate and voluntary, and are on the presumption that a rational being will not make admissions prejudicial to his interests and safety, unless when urged by the promptings of truth and conscience. The degree of credit to be given to the statements or alleged statements of defendant in this case is for the jury under the circumstances of the case and the manner in which they were made. Look over the

testimony, gentlemen, with reference to these statements. Were they made deliberately, intelligently and with understanding on the part of the prisoner?"

The instruction repeats language contained in Greenleaf on Evidence, vol. 1, §§ 200 and 214, where the author speaks of the weight to be given to evidence of verbal admissions and verbal confessions. Though there is authority to the contrary (Thompson on Trials, 2d ed. §§ 2431, 2432, and cases cited) we may assume that a warning like that contained in the offered instruction would be proper in cases to which the text of Greenleaf has application. The author was referring, and the offered instruction refers, to evidence of statements that may have been made under the influence of hope or fear, and to "the mere repetition of oral statements" that may not have been made at all. See Wigmore on Evidence, § 866; Horn v. State, 12 Wyo. 80, 124-127, 73 Pac. 705, 713-714. In the case at bar, there was no question of any statement having been the result of improper inducement. Defendant testified at length and made frequent reference to the evidence in regard to his statements. He did not deny that his answers to questions asked by the sheriff and prosecuting attorney were transcribed by a competent and disinterested stenographer, who testified as a witness and was not cross-examined. We do not think he intended to deny that the words he spoke were not accurately reproduced in the writing, but he did undertake to explain or qualify a few statements that seemed damaging on the matter of premeditation. For instance: He admitted that the writing correctly showed that in answer to the question, "When did you first make up your mind to kill your wife?", he answered, "Oh, I don't know for sure, I have been thinking of it for a month. She told me when I come here going to North Park that she would go back home with me when I came back through Cheyenne. I thought and talked

myself out of it for a month." At the trial he testified that in making this answer he did not mean that he had been thinking about killing his wife, but meant that he had been thinking to decide whether he should come to Cheyenne and make further effort to get her to go home with him.

As we think there was no substantial reason for doubting that defendant made the statements to which the instruction referred, the court was not required to give a warning instruction. We are sure that the giving of the instruction would not have induced the jury to disbelieve any of the state's evidence.

The state was permitted, over defendant's objection, to put in evidence four photographs of the scene of the crime, showing the dead body as it lay on the ground and surrounding objects including the wash room and clothes line where the deceased had been working. The ground of the objection was that the death of the woman had already been proved by other evidence and the only purpose to be served by the photographs was to create prejudice in the minds of the jury. The contention that the court erred in overruling the objection might be shortly disposed of by saying that the record fails to show that, when the ruling was made, the judge knew what defendant would admit or deny with respect to the objects shown on the photographs. But we shall assume, as counsel apparently do, that when the photographs were offered in evidence it was known that there would be no controversy in regard to anything shown thereby. Ordinarily, the jury is entitled to have a description of the scene of the crime, and to have the oral description by witnesses supplemented by a more accurate description by photographs. Wigmore on Evidence, § 792. That the photographs were unnecessary, because cumulative (See Tillman v. State, 112 Ark. 236, 166 S. W. 582; State v. Woods, 62 Utah 397, 220 Pac. 215; Snowden v. State, 133 Md. 624, 106 Atl. 5)

or because defendant admitted the facts thereby shown (1 Wharton, Criminal Evidence, § 24c; 16 C. J. 562; Currie v. State, 159 Ga. 775, 126 S. E. 835), may have authorized, but did not require, their rejection as evidence. We assume that photographs should be excluded when they do not tend to prove any controverted fact, but have a tendency to create unfair prejudice, on the same principle that, under like circumstances, authorizes or requires the exclusion of bloody clothing of the deceased, or instruments used by defendant in committing the crime. See Wigmore on Evidence, § 1157; State v. Moore, 80 Kan. 232, 102 Pac. 475; State v. Stansberry, 182 Ia. 908, 166 N. W. 359. The photographs in question merely gave the jury a better description than could have been given by words. They cannot be characterized as gruesome or inflammatory. The body of the dead woman lay on its back hiding the wound and blood. We cannot hold that the photographs had such a tendency to create unfair prejudice that it was the duty of the court to exclude them from the evidence.

The next point is in regard to alleged error in refusing to give requested instructions applicable to voluntary manslaughter. Our statute (R. S. 1931, § 32-205) adopts the common law definition of that crime by declaring that: "Whoever unlawfully kills any human being without malice expressed or implied, * * * voluntarily, but upon a sudden heat of passion, * * * is guilty of manslaughter, * * *." The given instructions contained this definition, and permitted the jury to return a verdict finding defendant guilty of manslaughter if they believed that the evidence did not warrant a verdict finding him guilty of murder in the first or second degree, but there was no instruction explaining what is meant by "sudden heat of passion." Defendant offered these instructions which the court refused to give.

A. "You are instructed that acts which might constitute murder in the first degree may, if sufficient provocation for the doing of the act by defendant appears, reduce the degree of the crime to manslaughter. It is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith all the facts and circumstances in evidence in this case, and if you find that by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection and that said facts and circumstances were sufficient to produce such a state of mind in a person of ordinary temper, then the proof of the sufficiency of the provocation satisfies the requirements of the law; and so, in this case, you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing and the adequacy of the cause, if any, producing such condition.

B. "In determining whether the provocation is sufficient to reduce homicide to manslaughter, ordinary human nature or the average of men recognized as men of fair average mind and disposition should be taken as the standard, unless the person whose guilt is in question be found to have some particular weakness of mind or infirmity of temper not arising from wickedness of heart or cruelty of disposition."

It is not necessary critically to examine or analyze the offered instructions for the purpose of deciding definitely whether or not they state correct principles applicable to the facts of the case. We assume, however, that instruction A correctly stated that the homicide would be no more than manslaughter if "defendant's mind at the time of the killing was incapable of cool reflection" as the result of provocation "sufficient to produce such a state of mind in a person of ordinary temper." See Bishop on Crim. Law, 9th ed. §§ 697, 701. There is serious doubt of the correctness of instruction B. It is the language of a dictum of Judge Christiancy in Maher v. People, 10 Mich. 212, 221, who in the same opinion several times stated the general rule, that the provocation must be something having a

tendency to arouse the passions of the ordinary or average man. Most of the cases follow the general rule, refusing to recognize the exception or extension stated in the latter part of instruction B. State v. Nevares, 36 N. Mex. 41, 7 P. (2d) 933, and authorities cited. But see State v. Green, 78 Utah 580, 6 P. (2d) 177, 186.

If instruction A was correct, the evidence did not call for instructions on manslaughter. It was clear from the evidence that the only provocation influencing defendant's conduct at the time of the shooting was the wife's refusal to return to his home. This was not provocation which the law deems sufficient to cause "a person of ordinary temper" to be "incapable of cool reflection." See Rodriquez v. Territory, 14 Ariz. 166, 125 Pac. 878, 884; Dancy v. State (Tex. Cr. App.) 46 S. W. 247; Hill v. State, 74 Tex. Crim. App. 481, 168 S. W. 864; State v. Rusk, 123 Minn. 227, 143 N. W. 782; People v. Garfalo, 207 N. Y. 141, 100 N. E. 698.

There is no claim that the instructions on murder in the first and second degrees were not correct. There is good authority for holding that, where the jury, correctly instructed on the two degrees of murder, finds the defendant guilty of murder in the first degree instead of murder in the second degree, defendant is not prejudiced by error in failing to instruct or by incomplete instructions on manslaughter. In People v. Granger, 187 N. Y. 67, 79 N. E. 833, the trial judge erroneously refused to give any instruction on manslaughter, but this was held not to be prejudicial in view of the conviction of murder in the first degree. The court reasoned thus:

"Of course, the court could not coerce the jurors and force a conviction for a greater crime than they would otherwise have found him guilty of, by withholding from their consideration a lesser degree authorized by the evidence and instructing them to acquit if they did not find him guilty of the greater crime. But, as we have seen, the defendant was indicted, charged with

the crime of murder in the first degree. This involved the intentional killing, with deliberation and premeditation, or of the killing with the intent to rob. The court submitted to the jurors the question as to the defendant's guilt under this charge and also instructed them as to the statutory definition of murder in the second degree, and instructed them that, in case they entertained a reasonable doubt as to his guilt of the crime charged they might determine the question as to his guilt of the lesser offense. The jurors, therefore, were not coerced into rendering a verdict in the first degree; for, under the charge of the court they had the right to convict in the second degree. The fact that they did not convict him of the lesser degree, indicated that they had no doubt as to his guilt of the greater offense, and, therefore, the failure to instruct them that they had the right to convict of manslaughter in the first degree, a lesser degree than that of murder in the second degree could not well have harmed the defendant."

The case was followed in People v. Brown, 203 N. Y. 44, 96 N. E. 367, Ann. Cas. 1913A 732, where the request for instructions on manslaughter was only partially complied with. The court said:

"The court had correctly and fully charged as to the two degrees of murder. Had the jury found the defendant guilty of murder in the second degree, there might be some ground for the assumption that the defendant's cause was prejudiced by the action of the court. Such a situation would have lent support to the claim that the jury might have declared the defendant guilty of a still lower degree of homicide had they received proper instruction from the court. All such speculations are dissipated, however, by the fact the defendant was found guilty of murder in the first degree. When the jury excluded from the case the alternative of murder in the second degree, all lower degrees were necessarily eliminated by the same rule."

See, also, People v. Serimarco, 202 N. Y. 225, 95 N. E. 553; State v. Munn, 134 N. C. 680; 47 S. E. 15; State v. Fuller, 34 Mont. 12, 85 P. 369; Braunie v.

State, 105 Neb. 355, 180 N. W. 567, 12 A. L. R. 658; People v. Boggs, 12 Calif. (2d) 27, 82 P. (2d) 368; note, Ann. Cas. 1913A 735.

In the case at bar an additional circumstance indicates that the failure to instruct more fully on manslaughter was not prejudicial. The jury were authorized to return a qualified verdict that would have been followed by a sentence of life imprisonment. The unqualified verdict not only determined that defendant was sane (excluding innocence), that the killing was malicious (excluding manslaughter) and premeditated (excluding murder in the second degree), but also declared that there was no evidence to induce the jury to reduce the punishment to life imprisonment. It is not to be supposed that the offered instructions would have caused the jury to find mitigating circumstances sufficient to reduce the crime to manslaughter from evidence that failed to convince them that the death sentence should not be imposed.

We do not think it necessary to discuss other assignments of error that refer to rulings on objections to evidence. We have given them careful consideration and do not think defendant was prejudiced by any ruling complained of.

It is not contended that the evidence is not sufficient to prove defendant guilty of a felonious homicide, but counsel earnestly argues that we should hold either that it was insufficient to warrant the verdict finding that the crime was murder in the first degree, or that it did not justify the death penalty.

In three cases, each appealed by a defendant found guilty of murder in the second degree, we have held that, in view of errors that may have been prejudicial to defendant on the question whether the crime was murder or manslaughter, the verdict should either be set aside and a new trial had, or stand, with the state's consent, as a verdict for manslaughter. See Espy and

Chapman v. State, 92 P. (2d) 549, 559, and cases cited. The procedure in those cases cannot be followed in this, as we do not find that there was any error that could have prejudiced defendant on the question whether the crime was murder in the first or a lesser degree. We have no doubt that the evidence justified the jury in finding that the killing was without any adequate provocation, with the motive of jealousy, and after deliberation, preparation and threat.

Counsel eloquently argues that the death penalty should not be assessed except for the most unjustifiable and ruthless slayings, and that it is excessive as applied to defendant who is no hardened criminal but a loving husband driven to distraction by brooding over the breaking up of his home and separation from his wife. We must not permit this argument to lead us to assert a power in this court either to interfere with the jury's discretion in assessing the punishment, or to grant a commutation of the sentence. Ordinarily at least, the decision of the jury in the exercise of its statutory duty to return a verdict that determines the punishment for murder in the first degree is not subject to review by the court. See People v. Superior Court, 202 Calif. 165, 259 Pac. 943. If we assume that an exception might be made in those cases in which it appears that an unqualified verdict may have been induced by errors or unfair conduct, we cannot say that this is such a case. The contention that the jury was too harsh in failing to show leniency where it was deserved, though entitled to consideration in connection with an application for commutation, is not a ground for interference by the court.

The judgment will be affirmed, and the court appoints Friday, April 19, 1940, as the day for execution of the sentence pronounced by the court below.

*Affirmed.*

RINER, Ch. J., and BLUME, J., concur.