## CURRIE *v.* THE STATE.

1. Where a defendant is on trial for murder, proper evidence as to the circumstances of the killing is not rendered inadmissible by an admission of the defendant in open court that he killed the deceased in the county of the jurisdiction.

2. The evidence was insufficient to show the offense of voluntary manslaughter, and the judge did not err in refusing the request to charge on that subject, or, by the charge which was delivered, in eliminating such offense from consideration of the jury.

3. The assignment of error upon the charge of the court instructing the jury that under the evidence justifiable homicide was not involved in the case was not insisted upon in the briefs of the attorneys for the plaintiff in error, and will be treated as abandoned.

4. The requests for instructions on the law relating to insanity, in so far as they stated correct principles of law applicable to the case, were covered by the general charge. This being so, the refusal to charge the exact language as requested is not cause for reversal of the judgment refusing a new trial.

5. The court was requested to charge as follows: "If you find the defendant guilty of murder, the punishment shall be death unless you recommend him to the mercy of the court, or that he be imprisoned for life; either recommendation is left entirely with you; you may consider all the facts which have developed in the case in making up your minds on this feature; you may also consider the alleged insanity or imbecility of the defendant, either independently or in connection with the other evidence in the case; but you are not limited or circumscribed in any respect. The law limits you with no rule for the exercise of your discretion. The matter is left entirely with you." *Held,* that this request was argumentative in character; and being so, the judge did not err in refusing it.

6. Under the counter-showing submitted by the State, there was no error in the judgment denying the motion for new trial based on the ground that some of the jurors improperly separated from the other jurors while the case was under consideration by the jury.

7. The evidence was sufficient to authorize the verdict, and the judge did not err in refusing a new trial.

No. 4335. FEBRUARY 19, 1925.

Murder. Before Judge Hardeman. Toombs superior court. February 28, 1924.

*Giles & Sharpe, I. H. Corbitt,* and *A. A. Lawrence,* for plaintiff in error.

*George M. Napier, attorney-general, Walter F. Grey, solicitor-*

*general, T. R. Gress, assistant attorney-general,* and *Lankford & Rogers,* contra.

ATKINSON, J. 1. Lee Currie was convicted on an indictment charging him with the murder of Burley Phillips. His motion for a new trial was overruled, and he excepted. The case has been before this court on three former occasions: *Curry* v. *State,* 150 *Ga.* 736 (105 S. E. 361); *Currie* v. *State,* 153 *Ga.* 178 (111 S. E. 727); *Currie* v. *State,* 156 *Ga.* 85 (118 S. E. 724).

At the commencement of the last trial the defendant formally admitted in open court that "the defendant, Lee Currie, killed Burley Phillips, and that he killed him in Toombs County, Georgia." J. W. Kirby, who lived about 3-1/2 miles north of Claxton, testified that about 10 or 11 o'clock on the morning of Friday, February 20th, the defendant, Currie, called at witness's house and gave him a hat (referring to the hat identified by another witness as the hat of Burley Phillips), on which was some blood, which Currie told witness he had found between Claxton and Pembroke. R. N. Kirby who lived in Bulloch County about 15 miles north of Claxton, testified that about 9 or 10 o'clock Friday morning, while going from his home to Claxton, he met Lee Currie on the road opposite the residence of J. W. Kirby, traveling in a new automobile, and there was "some blood and other stuff . . at different places on the car on the side and in the car;" also that Currie had an extra hat which he gave to J. W. Kirby. Currie explained the presence of the blood by saying that he had killed a hog, for which he had been charged $11, and that he had put the hog in the car and afterwards had thrown it in the river. S. A. Screws testified: The body of Burley Phillips was found on Tuesday morning. Witness saw Lee Currie in an automobile that morning at Durden's store, close to witness's shop, before the body was found. Witness noticed some blood on the fender and side of the car, which Currie explained by saying that on Friday morning he had run over and killed a yearling. George Smith testified that Lee Currie, traveling in an automobile, came to witness's house between 2 and 3 o'clock, which was after the body had been found that morning, and told witness that he (Currie) got the car in Milledgeville, and gave witness a pipe (which was identified by another witness as the pipe of Burley Phillips). W. D. Sutton testified: About sunrise on Friday morning Lee Currie passed witness's house, traveling

in an automobile. A calf was standing near the road, and witness saw Lee Currie run his car out of the road in order to run over the calf, and he did run over and kill it. Witness immediately examined the calf and found its neck broken, but there was no blood on it.

The defendant moved to exclude the above-stated testimony of each of the witnesses named, on the ground that it was irrelevant, illegal, and prejudicial in view of the admission which the defendant had made in open court at the beginning of the trial, as hereinabove indicated. The court overruled each of the motions and allowed the evidence to remain for consideration of the jury. These rulings were alleged to be erroneous in certain grounds of the motion for new trial. The court did not err in refusing to rule out the testimony. It was relevant as tending to show, in connection with other evidence, that the defendant committed the crime, and the mental attitude of the defendant at the time the crime was committed. It was the right of the State to introduce all competent evidence tending to show the commission of the homicide by the defendant, and the circumstances under which it was committed, in order to enable the jury to pass upon the guilt or innocence of the accused, and for their consideration, in the event of a conviction, in determining whether or not the defendant should be recommended to the mercy of the court, which would avoid capital punishment. It was not the right of the defendant to cause the court to reject evidence as to the circumstances of the killing, by making a formal admission in open court that he had killed the deceased in the county of the jurisdiction. See 1 Wharton's Criminal Evidence (10th ed.), 48, § 24C, and cases cited in note 1 on page 49; 16 C. J. 562, § 1089; State v. Jones, 89 Iowa, 183 (56 N. E. 427); People v. Frederick, 106 Cal. 559 (39 Pac. 944). The ruling made does not conflict, as contended, with the ruling in *Hendrick* v. *Daniel*, 119 *Ga.* 358 (2) (46 S. E. 438), holding: "It is not error to exclude evidence as to matters about which there is no dispute."

2. The judge refused certain timely written requests to charge the jury relating to the law of voluntary manslaughter, and on the contrary instructed the jury in effect that voluntary manslaughter was not involved in the case. The refusal of such requests, and the charge as given, prohibiting the jury from considering the offense of voluntary manslaughter, are made grounds of the mo-

tion for new trial. It is insisted in the motion that the testimony of the sheriff, George B. McLeod, as to statements made to him by the defendant, was sufficient to show the lesser grade of voluntary manslaughter. This testimony was as follows: "He said Burley told him to go and get some whisky for him, and he started to leave the car and cross the branch, and Burley called to him and wanted him to pay his taxi fare before he left, and he wouldn't do it, and said Burley started on him and pulled out his knife. . . He said that Burley asked him to get him some whisky, and he started off to get some whisky, and crossed a little branch, and Burley called to him and asked him to pay him for his taxi fare; and I don't remember what the reply was, but anyway he didn't do it, and he said Burley took out his knife and started toward him, and he pulled out his pistol and said just as he fired Burley turned." It is insisted that this testimony, under the ruling in *Curry* v. *State,* 150 *Ga.* 736 (supra), would have authorized a charge on the law of voluntary manslaughter as related to mutual combat, or a sudden quarrel where the parties fight upon the spot, or presently agree to fight, and that as a result of the fight the defendant kills the deceased. In the case cited it was stated that "Under the evidence and the defendant's statement the three grades of homicide, murder, voluntary manslaughter, and justifiable homicide, were involved." In that case the defendant made a statement before the jury, and the decision of the court was not based upon the evidence alone. In the case now under consideration the prisoner did not make a statement, and the evidence which he relied upon as reducing the crime from murder to voluntary manslaughter is substantially the same as was involved in the case of *Currie* v. *State,* 156 *Ga.* 85 (2) (supra), where it was held that the evidence did not require a charge on the subject of voluntary manslaughter. In that case, if the evidence had authorized a charge on the law of voluntary manslaughter, it would have been the duty of the judge to give appropriate instructions to the jury on the law relating to that offense, even though not requested, and consequently it would have been erroneous for the judge to eliminate the law of voluntary manslaughter from consideration of the jury. If in that case the evidence had been sufficient to support a verdict finding the defendant guilty of voluntary manslaughter, a different decision would have been required. In this case the evidence, as in the case last cited,

was insufficient to show the offense of voluntary manslaughter, and the judge did not err in refusing the request to charge on that subject, or, by the charge which was delivered, in eliminating such offense from consideration of the jury.

3. The charge which was given, as referred to in the preceding division, contained the further statement: "Nor do I present to you the law of justifiable homicide; it is not involved or injected into this case under any theory of the testimony." It is insisted in the motion for new trial that the evidence referred to in the preceding division was sufficient to authorize a verdict of justifiable homicide, and that the court erred in excluding this defense from the consideration of the jury. The assignment of error upon this portion of the charge is not insisted upon in the briefs of the attorneys for the plaintiff in error, and consequently will be treated as abandoned.

4. Before the judge concluded his charge to the jury, a written request to charge was presented to him by the attorneys for the defendant. The paper consisted of several paragraphs which were separately numbered 1 to 10, inclusive. Some of them had reference to the law as related to insanity, others to the law as related to voluntary manslaughter, and one to the authority of the jury in a capital case, in the event of a conviction, to recommend the prisoner to the mercy of the court. The 6th ground of the motion for new trial sets out a full copy of the requests to charge, and complains of the refusal of the judge to charge as requested. In the 7th, 9th, 10th, and 11th grounds of the motion for new trial complaint was made of the refusal of certain alleged requests to charge, which were identical with certain of the paragraphs of the paper above referred to as set out in the 6th ground of the motion for new trial. As to each of these the judge, in his order approving the ground of the motion for new trial, stated that "no such written request was separately presented to the court to charge. The language therein quoted as having been requested was contained in the general request to charge in language, form, and substance as set out in the 6th ground." The paragraphs of the request which related to insanity were as follows: (1) "I charge you that if you find from the evidence the mind of the defendant at the time of the killing was diseased, that his mental faculties had become deficient to such an extent that he had no controlling mental

power, no mental power governing his will or conscience, or if through the overwhelming power of mental disease his intellectual power is for the time obliterated, and his mental disease is the efficient cause of the act, his defense of insanity would have been shown, and you would be authorized to find him not guilty because of insanity." (2) "To be held criminally responsible a man must have reason enough to be able to judge of the character and consequences of the act committed, and he must not have been overcome by an irresistible impulse arising from mental derangement amounting to insanity, idiocy, or imbecility, amounting to lunacy." (5) "While the law requires the defense of insanity to be proved by the defendant by a preponderance of the evidence, yet before you gentlemen of the jury would be authorized to convict this defendant of murder, you must be convinced beyond a reasonable doubt that there is in the case all the elements which go to make a case of murder; that is, that Burley Phillips was unlawfully killed by the defendant with malice aforethought, either express or implied, and that the defendant, Lee Currie, was at the time of the killing a person of sound mind and discretion." (9) "You may consider the evidence of insanity in determining whether or not an impairment of his mind made the defendant not altogether normal, and contributed to the cause of a passion, suddenly aroused, which became irresistible and caused the defendant to kill the deceased."

The court did not give instructions in the exact language as requested, but, after defining murder and charging generally with reference thereto, the following instructions were given:

"Then if the State establishes the things that I told you that go to constitute murder, then the defendant has the right, without specially pleading it or setting up or filing any special defense along that line under this plea of general issue of not guilty, [to] introduce evidence upon the trial of the case with reference to his mental irresponsibility. Now then, gentlemen, the burden is on the State to make out its prima facie case beyond a reasonable doubt, as I have told you, and it is the law that where it is established the defendant then would be presumptively of sound mind and responsible in law for his acts, and the burden is on the defendant where he asserts by evidence and contends before the court and jury that he ought to be acquitted and discharged because of mental

irresponsibility in law. The burden is on the defendant to make good such defense by the preponderance of the evidence. And by the preponderance of the evidence is meant that greater weight of the evidence, the superior weight of the evidence on that issue, that degree of testimony, that weight of evidence which is sufficient to incline the mind of a fair, honest, impartial juror to that side of the issue rather than to the other. And if the defendant by the preponderance of the evidence, the superior weight of the evidence, the greater weight of the evidence, of which you gentlemen are the sole judges, which does not necessarily mean the greater number of the witnesses, but you are to pass upon it and say what the greater weight is and what weight and credit you will give the testimony; and if the defendant by the superior weight of the testimony has established that he is mentally irresponsible under the law for his acts, if he committed any act charged against him, then the jury ought to wholly acquit him and discharge him, or if taken altogether the testimony produced by the State and what other evidence may have been introduced by the defendant in reference to his mental condition, if taken together the jury entertains a reasonable doubt about the defendant's guilt, you would give him the benefit of that doubt and acquit him. Now, then, I have used the words 'mental irresponsibility.' The code declares, and it is the law of this State and I give it to you in charge, that a person shall not be convicted of any crime or misdemeanor who is an idiot or a lunatic or afflicted with insanity, and in my own way I expect to give you the law applicable to this case with reference to mental irresponsibility. This is the general rule, and I will give you the exception in order that you may apply every rule of law that the court gives you in charge to the testimony in this case. The general rule is that if a man understands the distinction, the difference, between right and wrong, and if he has sufficient reasoning power and mental capacity to form a definite criminal intent and to know and understand that what he is about to do is wrong, and to comprehend the nature and character of the act that he is about to commit and understand the consequences and to do it is wrong, then I charge you that the general rule is that he would be responsible in law for any criminal act that he may commit.

"On the other hand, if a man does not know the difference between right and wrong, if he is an idiot, a lunatic, or afflicted with insanity,

or if he has not sufficient mental capacity to understand and to comprehend the nature and character and quality of his act, if he has not sufficient mental capacity to know that the act that he is about to commit is a wrong act, if he has not sufficient mental capacity to form a definite criminal intent and purpose and to know that to carry it out would be wrong, then I charge you, gentlemen, that the general rule is that he would be mentally irresponsible in law and should not be convicted of any crime or misdemeanor at all. There is an exception to that rule, and this is the exception: that a person may generally know the difference between right and wrong; that originally and generally a person may be of such mental capacity that he can form an intent and purpose and know that an act about to be committed is wrong; yet if a person has a mental disease, some affliction of mind, and the person is so afflicted that his will is overmastered and overpowered with reference to some particular act, then if he does a thing which is the product of such diseased mind, and with reference to such act his reason is overwhelmed and his mind overmastered with reference to the particular thing he does and he has not sufficient will power by reason of such mental condition to resist the impulse to commit the act, then, gentlemen of the jury, he is not responsible in law, and if that should be the truth he should be wholly acquitted and discharged, or if the jury entertain a reasonable doubt about it he should be acquitted and discharged. On the other hand, if you believe, at the time that the defendant, if he did any act charged against him, yet if you believe at the time Burley Phillips was killed, if he was killed, if you believe that Lee Currie killed him in the manner and form alleged in this indictment, and killed him in Toombs County, Georgia, if you believe then that the defendant had sufficient mental capacity to know the distinction between right and wrong and that at the time he was suffering with no mental disease or disease of the mind that overpowered him and overmastered him, that his will was not dethroned, that he was not suffering with that irresistible impulse that he could not resist because of mental disease, and if he understood the nature and character of his act, and it was wrong, and he shot and killed Burley Phillips with the intention to take his life, then I charge you gentlemen he would be guilty of murder and the jury ought to so find."

By comparison of the request with the charge as given on the

subject of insanity, it will be perceived that the requests, in so far as they stated correct principles of law applicable to the case, were covered by the general charge. This being so, the refusal to charge the exact language as requested is not cause for reversal of the judgment refusing a new trial.

5. The 10th paragraph of the requests to charge was as follows: "If you find the defendant guilty of murder, the punishment shall be death unless you recommend him to the mercy of the court, or that he be imprisoned for life; either recommendation is left entirely with you; you may consider all the facts which have developed in the case in making up your minds on this feature; you may also consider the alleged insanity or imbecility of the defendant, either independently or in connection with the other evidence in the case; but you are not limited or circumscribed in any respect. The law limits you with no rule for the exercise of your discretion. The matter is left entirely with you." The judge refused to give to the jury the requested charge, but instructed them as follows: "In this case, gentlemen, the law says that the punishment for murder shall be death unless the jury trying the case within their discretion recommend that the punishment shall be life imprisonment. . . If you find he is guilty and in your discretion you wish to recommend life imprisonment, then the form of your verdict would be, 'We, the jury, find the defendant guilty, and recommend life imprisonment.' " After the jury had been out considering the case all night they requested to be brought into court for further charge. A juror stated: "I think there is probably one or two of the jurors who wish to know as to whether or not, if the defendant is guilty of cold-blood murder, if they have the right to recommend mercy; if they have the right or privilege of recommending mercy." The court responded: "All I can say to you, gentlemen, is clear and explicit, the charge that I undertook to deliver on yesterday. It will be impossible for the court to answer in exact terms of the question about cold-blooded murder. Murder I have defined to you as the unlawful killing of a human being, by a person of sound memory and discretion, with malice aforethought, either express or implied. And I have defined malice, both express and implied, express malice being the deliberate intention unlawfully to take human life, and implied malice being where there is no considerable provocation for a killing, but where all the facts and

circumstances show an abandoned and malignant heart. I charged you fully on the defense of insanity. So that, after defining all those matters, I come to the question of punishment, and the law declares that the punishment for murder shall be death unless the jury trying the case, in their discretion, recommend that the prisoner be punished by life imprisonment. Therefore, in this case, in the event the jury write [a] verdict without reference to degrees, just a simple verdict if you find the defendant guilty—if your verdict should be, 'We, the jury, find the defendant guilty,' and sign it without saying more, the court would be without discretion, and the death penalty would be imposed. But if the jury find the defendant guilty as charged, they may add to that verdict, in their discretion, if they see fit to do so, but before signing it, 'but we recommend that he be punished by imprisonment in the penitentiary for life.' And in that event the form of your verdict would be, 'We, the jury, find the defendant guilty, and recommend that he be punished by imprisonment in the penitentiary for life.' That is a matter with the jury in this case, and it is within their discretion as to whether you add that recommendation or not. That is as far as I would be permitted to go." It thus appears from the charge of the court that the court instructed the jury in the language of the code. The substance of the request had reference to matters that the attorney might properly argue before the jury, but a judgment will not be reversed for a refusal to give a charge that is argumentative in character. The request to charge is of that character, and the judge's refusal to charge as requested affords no cause for reversal.

6. Another ground of the motion for new trial was: "Because the jury was allowed to separate, as shown by the affidavits of A. S. Odom and Mrs. C. C. Carrallton, which are hereto attached as exhibit A and B, said separation being unknown to the defendant or to his attorneys who attended and handled the trial of the case." In exhibit A the deponent stated that after all the evidence had been submitted to the jury and before the verdict had been reached, and while the jury "was quartered" at a named hotel, two of the jurors left the room in which the jury was quartered and went out at the back door of the hotel into the back yard, where they disappeared from view and remained out for at least thirty minutes before returning to the hotel; that the two jurors were not accom-

panied by a bailiff or any other officer of court; that while the two jurors were absent from the hotel the remainder of the jury trying the case were somewhere in the front of the hotel; that at the time deponent saw the two jurors leave the hotel deponent was not a bailiff or other officer of the court, nor was he bailiff or other officer of the court at any time during that special term of court. In exhibit B the deponent stated substantially all that is said above with reference to separation of the jury by two of the jurors; also, that at a different time while the jury was considering the case, one of the jurors left the hotel and went out the back way in company with A. S. Odom, who was not a member of the jury or a bailiff of the court; that the juror and A. S. Odom remained away from the hotel and the other jurors for some fifteen minutes; that no bailiff or other person accompanied A. S. Odom and the juror while they were away from the hotel; that deponent does not know the names of either of the jurors, but does know that they were members of the jury empaneled to try the case, because she was a boarder at the hotel at the time of the trial and had frequent opportunities to view the jury.

At the hearing of the motion for new trial there were other affidavits in support of the ground just stated, and counter-affidavits offered by the State. Some of the affidavits that were introduced at the hearing referred to a separation of the jury during the night, caused by six of them occupying one bedroom in the hotel, and the other six with the bailiff in charge occupying a different room in the hotel. The separation thus referred to in the last-mentioned affidavits was not made a ground of the motion for new trial. By a counter-showing there was evidence denying the charge that two of the jurors separated from the jury. This authorized the judge to find that there was no separation by two of the jurors, and consequently that the charge of misconduct by such jurors was not sustained. Relatively to the one juror who was alleged to have separated from the others, that juror, whose name was T. J. Ainsworth, testified: "That said jury was stopping at the Godwin House, and that it was necessary for deponent to go to the toilet, the toilet in the house being in use at the time, and that M. L. Clarke, the bailiff in charge of said jury, asked one Aldin Odom to show deponent the toilet, and that said Odom walked with deponent a short distance and showed him said toilet, deponent returning

to the jury in a few minutes. Deponent further says that he and the said Aldins Odom did not discuss said case on this occasion; neither did he hear any one else discuss said case while he was away from said jury. At the time referred to above, no evidence had been submitted to the jury trying said case, said jury having been impaneled and sent to supper at the Godwin House." Odom, the man referred to in the testimony of the juror, testified, "that cne of the jurors, T. J. Ainsworth, had to go to the toilet, and that M. L. Clarke, the bailiff that had the jury in charge, asked deponent, deponent being a deputy sheriff at said time, to show said Ainsworth the toilet; that he went with said Ainsworth a short distance and showed him the toilet; that during said time that he was with said Ainsworth from the time that they left the house until they returned they did not discuss the case, . . nor did deponent hear any one else discuss the same." In *Stix* v. *Pump,* 37 *Ga.* 332, it was held: "Where a jury has been charged with the consideration and determination of a cause, the court should not permit them to disperse without the consent of the parties to the cause on trial. If it be necessary that any of the persons should be temporarily absent, they should be accompanied by an officer." The judge was authorized to find that the juror did no more than separate from the other jurors for a few minutes on account of a personal necessity, and that he was accompanied by an officer as required by the above rule, and consequently that there was no misconduct. In the circumstances the refusal of the judge to grant a new trial on account of such separation affords no cause for a reversal. If the facts were sufficient to show misconduct as in the cases of *Daniel* v. *State,* 56 *Ga.* 653, *Shaw* v. *State,* 83 *Ga.* 92, *Obear* v. *Gray,* 68 *Ga.* 182, and *Styles* v. *State,* 129 *Ga.* 425 (59 S. E. 249, 12 Ann. Cas. 176), there would be a presumption of injury to the defendant that would have to be rebutted by the State; but the facts in those cases were different from those involved in the present case.

7. The evidence was sufficient to authorize the verdict, and the judge did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting from the rulings in the second, fifth, and sixth headnotes.*