## HAWKINS *v*. STATE OF INDIANA.

[No. 27,534. Filed November 5, 1941.]

118

*Charles R. Turner*, of New Albany, *Grover C. Todd*, of Jeffersonville, and *Wilson & Nichols*, of Munford, Kentucky, for appellant.

*George N. Beamer*, Attorney General, *James K. Northam*, First Assistant Attorney General, *Norman E. Duke*, Deputy Attorney General, and *Homer O. Smith*, of Jeffersonvile, for appellee.

RICHMAN, J.—Appellant was convicted of murder in the perpetration of a robbery and sentenced to be electrocuted. The errors assigned will be considered in the order presented by the briefs.

November 13, 1940, by agreement of the parties the case was set for trial on the 16th day of December thereafter and appellant's request for a special venire of 75 talesmen was granted. The trial began at 9

o'clock a. m. on the date set and the regular panel and the special venire of 75 were exhausted. During the day appellant's motion for a second special venire of 25 talesmen was granted, the jurors were drawn instanter and the sheriff directed to summon them for the following morning. At that time selection of the jury was continued but before the end of the day the special venire of 25 was exhausted. During the second day appellant by oral motion requested another special venire of 25, which motion was overruled, and the court directed the sheriff to select the remaining talesmen from "bystanders or citizens of the county," as permitted by § 4-3308, Burns' 1933, § 1279, Baldwin's 1934, when for various reasons named in the statute "no traverse jury shall be present." Appellant exhausted his twenty peremptory challenges. The record does not show that after his motion for a special venire was overruled he made further objection to any "bystander" talesman. How many of the members of the jury were from "bystanders" does not appear. It is not charged that any of the persons so selected was not a competent juror. Nor is it made to appear that either party was denied the right to challenge any such talesman for any of the numerous causes provided in § 9-1504, Burns' 1933, § 2254, Baldwin's 1934.

The right to a special venire is not absolute but under the statute, § 4-3309, Burns' 1933, § 1271, Baldwin's 1934, rests in the discretion of the trial court. While neither *Harlan* v. *State* (1921), 190 Ind. 322, 130 N. E. 413, nor *Crickmore* v. *State* (1938), 213 Ind. 586, 12 N. E. (2d) 266, presents the same factual situation as this case, we think the reasoning of these cases is applicable and that, no abuse of discretion appearing, the alleged error is not available to appellant.

He cites only two cases. The first, *Hicks* v. *State* (1927), 199 Ind. 401, 156 N. E. 548, is not in point. The other, *Silverman* v. *State* (1927), 199 Ind. 225, 156 N. E. 549, is distinguishable. The court therein recognized that the exercise of the power to call a special venire "requires that the court act within the confines of a sound discretion" but held that the trial court determined the necessity for such venire by ordering the sheriff to summon a panel of thirty bystanders, five more than in the special venire requested, and that the necessity so found to exist did not warrant the trial judge in ordering their selection in a manner different from that prescribed in the statute. It also appears from the opinion that the motion and the order to the sheriff occurred several days before the day set for trial. In the case at bar the motion was made toward the end of the second of two days devoted to examination of talesmen. There may then have been in the jury box eleven jurors tentatively accepted. If so, the judge might reasonably have considered unnecessary a special venire of 25 to obtain one juror. Even if more than one was to be obtained we cannot say from the record that the judge abused his discretion in denying the motion.

Misconduct of two jurors, William Robison and, George E. Judd, is charged. Robison's conduct was made the subject of a verified motion praying that the cause be withdrawn from the jury, which was overruled. In his motion for a new trial appellant again raised the question as to Robison and for the first time as to Judd. In each case the misconduct alleged was that after he was accepted as a juror but before he had heard any evidence he expressed the opinion that appellant was guilty and should be given the death penalty. Affidavits and

counter-affidavits were filed and on the motion for a new trial evidence was heard including that of the two jurors, each of whom denied the alleged misconduct. Appellant's attorneys exercised their right of cross-examination at this hearing. The trial court in overruling the motion for a new trial evidently decided there was no misconduct. We cannot override his conclusion on a question of fact where there was conflicting evidence. *McCallister* v. *State* (1940), 217 Ind. 65, 26 N. E. (2d) 391; *Anderson* v. *State* (1933), 205 Ind. 607, 186 N. E. 316; *Clodfelder* v. *State* (1926), 198 Ind. 277, 151 N. E. 725.

The record discloses that juror Judd was chosen from the second special venire. The names of the talesmen in that and the first special venire appear in the record. The names of the members of the regular panel do not appear. We are therefore unable to determine whether Robison was a member of the regular panel or a "bystander." Neither the affidavits nor the testimony on the motion for new trial disclose how he was selected. There was no testimony indicating that he made false answers when he was being questioned as to his qualifications to sit as a juror. If he was a "bystander" we may assume from the state of the record that he was then acceptable, except as his right to serve was challenged generally by the motion for a special venire. Appellant has no valid complaint either as to manner of selection or the personnel of the jury.

One of the witnesses called by the state was Clementine Luttrell. After she had been examined and cross-examined she was dismissed. Later after other witnesses had been examined, appellant asked that she be recalled for further cross-examination and five ques-

tions were asked, to each of which the state's objection was sustained. Appellant claims error in these rulings.

The first was clearly improper. She was asked if she had not been "charged in the Clark Circuit Court as an accessory or accomplice in this charge of the murder of Edmund Davis." The purpose of the question could only be to affect her credibility as her identity was not in question. As said in *Petro* v. *State* (1933), 204 Ind. 401, 412, 184 N. E. 710, 713, "the mere fact that a person has been arrested or a charge been placed against him is no evidence of his guilt, and should not be the basis of a question to affect his credibility as a witness."

The next three questions in varying language all ask the same thing in substance, whether she was promised immunity from a murder charge if she would testify in this case. After objection to one of them had been sustained the record shows the following:

"The Court: She has answered this morning, Mr. Turner, that she was not influenced on any promise. You can ask her anything on cross-examination attacking her credibility as a witness.

"Mr. Turner: I have to ask these questions for the record. I know they are going to be overruled.

"The Court: Why ask them? Go ahead."

The testimony referred to was as follows:

"Q. Were you promised anything before you testified here today, by the State of Indiana?

"A. I was not promised anything."

It had already been shown in the first cross-examination that while this trial was in progress she had pleaded guilty to a delinquency charge and had been sentenced to the Indiana Girls' School until she should be twenty years old. She was then seventeen.

The trial court has a broad discretion in determining the extent to which may be carried an examination for the purpose of affecting the credibility of a witness. *Peats* v. *State* (1938), 213 Ind. 560, 575, 12 N. E. (2d) 270, 278. The same broad discretion exists as to the latitude of cross-examination. *Foust* v. *State* (1928), 200 Ind. 76, 84, 161 N. E. 371, 374. Where the question calls for a repetition of an answer previously made by the same witness, it is not error to sustain objection to the question. *Drury* v. *State* (1929), 200 Ind. 544, 547, 165 N. E. 321, 322; *Griffin* v. *State* (1933), 124 Tex. Cr. Rep. 233, 61 S. W. (2d) 509. The trial court evidently had this rule in mind when he sustained the objection. We fail to find any abuse of discretion.

The fifth question was: "Were you advised that you could refuse to testify in this case on the grounds that your evidence would tend to incriminate you?" Appellant does not indicate what answer he was expecting to this question. Whether "yes" or "no," the answer would have tended to show only that she knew or did not know her constitutional privilege. This was personal and might be waived. Neither answer would have indicated any bias against appellant. We can see no harm in sustaining the objection.

Appellant tendered 28 instructions, all of which were given except two. By these he sought to have the jury instructed that under the indictment for murder while perpetrating a robbery, he could be convicted of murder in the second degree, manslaughter, or involuntary manslaughter. This court has held otherwise in *Swain* v. *State* (1938), 214 Ind. 412, 15 N. E. (2d) 381; *Mack* v. *State* (1932), 203 Ind. 355, 180 N. E. 279, and *Cole* v. *State* (1922), 192 Ind. 29, 134 N. E. 867. The reason is found in the fact that neither premeditation, intent to kill, nor malice is a

necessary element of the crime charged. This was long ago decided in *Stocking* v. *State* (1855), 7 Ind. 326. The instructions were properly refused.

Most stress is laid by appellant upon alleged error in the admission of certain photographs. There is no contention that any of them was not properly identified, nor that it did not correctly represent the object photographed at the time of its taking.

Exhibits 6, 7 and 8 were photographs of the taxicab in which the crime was committed. No. 6 shows the exterior including the rear license plate, No. 7 is a view of the interior taken from the left outside with both doors open and shows blood upon the floor behind the driver's seat, No. 8 is a closer view of the blood in two places on the floor behind the front seat. The killing occurred near Jeffersonville, about 8:30 o'clock p. m. May 20, 1940. Appellant and his two accomplices drove the taxicab about eighty miles north and abandoned it in a secluded place in Bartholomew County where it was discovered by a farmer May 23, 1940. The photographs were taken on the day it was found in the condition when found.

Exhibit 12 is a photograph of the decomposed body of a man, lying face down in dense weeds or grass with hands bound together behind his back. The body was found May 26, 1940, and was not disturbed until the photograph was taken.

Exhibit 24 is a photograph of the skull of the decedent. The skin and flesh had been removed. A jagged hole appears in the left temporal region with cracks radiating therefrom. The shoulders and a part of one arm are also shown. The photograph was taken May 26, 1940, after the body had been removed to a morgue in Jeffersonville.

The principal objection urged at the trial and argued in the briefs is that these photographs were introduced

for the purpose of "prejudicing" the jury. The latter two are characterized by appellant as "gruesome." When No. 24 was offered in evidence appellant's attorney stated: "Your Honor, the *corpus delicti* we are prepared to admit it is the body of Edmund J. Davis and it is only offered for the purpose of prejudicing the rights of this defendant." This statement was not made until after all the other photographs had been admitted. While this exhibit was being identified appellant's attorney also said that "if it is for the purpose of *corpus delicti,* that has been proved."

The substance of appellant's claims of error in admitting these photographs we paraphrase as follows:

1. They do not portray the taxicab or body as of the time when the crime was committed.

2. They were admitted in evidence to prove that which was admitted by the defense.

3. Gruesome pictures prejudiced the jury.

The general rule as to the admission of photographs in criminal cases is stated as follows:

"A photograph, proved to be a true representation of the person, place, or thing which it purports to represent, is competent evidence of anything, of which it is competent and relevant for a witness to give a verbal description." 23 C. J. S. Criminal Law § 852, p. 51.

Dean Wigmore states the rule:

"A photograph, like a map or diagram, is a witness' pictured expression of the data observed by him and therein communicated to the tribunal more accurately than by words. Its use for this purpose is sanctioned beyond question." 3 Wigmore on Evidence (3rd ed.) § 792, p. 178.

Cited under this text are numerous criminal cases holding proper the admission of photographs picturing the scene of the crime, objects used in its commission, the

body of the victim and other details enabling the jury to visualize what actually occurred. Their relevancy, it seems to us, is determined by the inquiry as to whether or not a witness would be permitted to describe the objects photographed. ". . . ordinarily whatever the jury may learn through the ear from descriptions given by witnesses they may learn directly through the eye from the objects described." *State* v. *Moore* (1909), 80 Kan. 232, 237, 102 P. 475, 477. The same rules applicable to objects connected with the crime apply to photographs of such objects. 3 Wigmore on Evidence (3rd ed.) § 792, p. 185.

In this case there was no objection to detailed testimony of all the facts shown by the photographs. But this in itself seems to be a ground urged for their exclusion, that is, the lack of necessity for their introduction. Ordinarily a party is not limited in presenting to the jury the facts upon which he relies. More than one witness may testify to the same fact. We see no reason, therefore, why a witness may not describe in words what he saw and also supplement his testimony with photographs, which frequently give the jury a more accurate picture than the verbal description.

Appellant's objection that the photographs were not made at the time the crime was committed if taken at its face value would exclude practically all photographs, for few crimes are publicized by the presence of a photographer. This objection was not allowed in *Chance* v. *State* (1923), 156 Ga. 428, 119 S. E. 303. In *Caveney* v. *State* (1936), 210 Ind. 455, 4 N. E. (2d) 137, we held that no error was committed in admitting photographs taken more than five months after the crime was committed. In that case there was testimony that the conditions had not substantially changed, although it was evident that seasonal changes

affecting foliage and vegetation had occurred. In the case at bar the circumstances were such that the jury might reasonably have inferred that the body had not been moved after appellant assisted in dragging it to the place where it was found and that the taxicab had not been disturbed after it was abandoned by him on the night of the crime.

There is no merit in the second claim. Appellant under pleas of not guilty and insanity was on trial represented by at least three attorneys who were resisting every effort of the prosecution to prove his guilt. The state had in its possession two confessions which as later herein shown were sought to be excluded. But when the photographs went into evidence no element of the crime had been admitted, even in the form of a repudiated confession. Sensing a possible damaging effect his attorneys coupled their objection to the last photograph with the statements that the *corpus delicti* had been proved and would be admitted.

"Generally speaking, the term 'corpus delicti' means, when applied to any particular offense, that the specific crime charged has actually been committed by someone." 14 Am. Jur., Criminal Law § 6, p. 758. An admission of the *corpus delicti* was not an admission that appellant was the "someone" who committed the crime. His connection therewith and the details thereof as a basis for determining his punishment, for the jury had a choice between the death penalty and life imprisonment, were still matters to be shown.

A quotation from *State* v. *Moore,* 86 Kan. 232, 234, 102 P. 476, characterized by Dean Wigmore as a leading case (see 4 Wigmore on Evidence [3rd ed.] p. 256), is pertinent:

". . . . When the jacket was offered counsel for appellant sought to forestall its exhibition to the jury by the statement to the court that no evidence would be introduced on the part of the defense concerning the shooting. In the case of *State* v. *Jones*, 89 Iowa 182, the syllabus reads:

" 'The fact that the defendant, in a prosecution for homicide, admits the killing, is not a ground for the exclusion of the weapon, with which the crime was committed, from evidence.'

"This is true for two reasons. The bare admission of the killing subtracts little from the issues, and it may be very important for the state, with the burden resting upon it to establish all the charges of the indictment or information beyond a reasonable doubt, to make its own case in its own way; and the evidence may be very valuable in illustrating or establishing other material facts. Beyond this, the statement under consideration was too carefully guarded. It did not admit the shooting or any other fact connected with the homicide, not even that appellant's wife was dead. Its import was merely that whatever the state proved relating to the shooting would not be contradicted, and the burden still rested on the state to prove every fact alleged in the information beyond a reasonable doubt.

"Several witnesses who were present described all that occurred at the shooting, and a physician who examined the body of the deceased after death described the location, extent and effect of the wounds inflicted. Therefore it is argued that the evidence afforded by the jacket was wholly immaterial and unnecessary. The jacket supplied competent proof of relevant and material facts, and it is not for appellant to say how much proper evidence shall be produced against him. Especially is this true when he is standing upon all his rights under a general plea of not guilty. Perhaps all the eyewitnesses need not have been examined, but appellant had no right to insist that the state be limited to one or two or three of them. Perhaps the physician's testimony might have been confined to matters not proved by the jacket, but it could not be rejected because of the duplication. The in-

animate garment told clearly and truthfully the story of a woman shot twice in the back, and hence, by legitimate inference, maliciously, wilfully, deliberately, premeditatedly, and without justification or excuse. It had a rightful place among the accusing witnesses, none of whom could be set aside at appellant's option because they were numerous."

On the same subject we find in 9 Wigmore on Evidence (3rd ed.) § 2591, p. 589, the following:

"Nevertheless, a colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate *moral force of his evidence;* furthermore, a judicial admission may be cleverly made with grudging limitations or evasions or insinuations (especially in criminal cases), so as to be technically but not practically a waiver of proof. Hence, there should be no absolute rule on the subject; and the trial Court's discretion should determine whether a particular admission is so plenary as to render the first party's evidence wholly needless under the circumstances."

If we should adopt this view the inquiry in this court would be whether the trial court abused his discretion. We could not so hold under the circumstances here appearing.

The photographs, particularly Exhibits 12 and 24, are described by appellant as "gruesome." Repulsive would be a better word. The issue however is not the descriptive word but whether either of the exhibits tended to excite such an emotional disturbance in the minds of the jurors as improperly to influence their verdict.

There would be no need for this consideration if the jury had been charged only with the determination of appellant's guilt. But it also had to choose between two penalties. We have read carefully all the evidence and are satisfied that the jury could reasonably have

reached no other conclusion as to guilt, though the penalty to be inflicted doubtless depended in some degree upon emotional reaction to the evidence.

We can think of details that might legitimately have been told by witnesses that are not shown by either Exhibit 12 or 24. The stench of human flesh putrefying in the weeds under a hot May sun can be described but not photographed. In fact the oral testimony in this case paints a picture just as repulsive as those shown by the photographs. They confirm, perhaps without adding, details, the bound hands, the cracked skull, which it was proper to relate to the jury. The extent of the head injury was material for appellant in his confession sought to leave the impression that his striking the driver of the taxicab on the head with a lead pipe was an attempt to save him from being shot by his confederate. The photograph of the skull gave the jury an accurate picture of the jagged hole and radiating cracks, indicating not a mild knockout tap but a violent blow.

We quote again from *State* v. *Moore,* 86 Kan. at 235, 102 P. 476:

> "It is argued that the introduction in evidence of the dead woman's bloody jacket destroyed the mental poise of the jury by riveting their minds upon a scene of carnage to the exclusion of any calm consideration of appellant's sanity, the only matter finally disputed by way of defense. The state rested under the necessity of establishing a tragedy involving the violent death of a human being from mortal wounds deliberately inflicted with malice aforethought—a thing most likely to include some blood along with the wickedness; perhaps, too, the terrifying report of pistol-shots in a peaceful street on a Sunday morning just after church, the piteous appeals for life and the agonized death screams of a defenseless woman as she is being shot down, and other shocking things. Such a subject is never a nice one to investigate.

Any of the details have a decided tendency to horrify and to appall; but a court can not arrange for lively music to keep the jury cheerful while the state's case in a murder trial is being presented, and gruesome evidence can not be suppressed merely because it may strongly tend to agitate the jury's feelings."

In *State* v. *Lantzer* (1940), 55 Wyo. 230, 244, 99 P. (2d) 73, 77, the court said:

"The state was permitted, over defendant's objection, to put in evidence four photographs of the scene of the crime, showing the dead body as it lay on the ground and surrounding objects including the washroom and clothes line where the deceased had been working. The ground of the objection was that the death of the woman had already been proved by other evidence and the only purpose to be served by the photographs was to create prejudice in the minds of the jury. The contention that the court erred in overruling the objection might be shortly disposed of by saying that the record fails to show that, when the ruling was made, the judge knew what defendant would admit or deny with respect to the objects shown on the photographs. But we shall assume, as counsel apparently do, that when the photographs were offered in evidence it was known that there would be no controversy in regard to anything shown thereby. Ordinarily, the jury is entitled to have a description of the scene of the crime, and to have the oral description by witnesses supplemented by a more accurate description by photographs. Wigmore on Evidence, § 792. That the photographs were unnecessary, because cumulative (See Tillman v. State, 112 Ark. 236, 166 S. W. 582; State v. Woods, 62 Utah 397, 220 Pac. 215; Snowden v. State, 133 Md. 624, 106 Atl. 5), or because defendant admitted the facts thereby shown (1 Wharton, Criminal Evidence, § 24c; 16 C. J. 562; Currie v. State, 159 Ga. 775, 126 S. E. 835), may have authorized, but did not require, their rejection as evidence. We assume that photographs should be excluded when they do not tend to prove any controverted fact, but have a tendency

to create unfair prejudice, on the same principle that, under like circumstances, authorizes or requires the exclusion of bloody clothing of the deceased, or instruments used by defendant in committing the crime. See Wigmore on Evidence, § 1157; State v. Moore, 80 Kan. 232, 102 Pac. 475; State v. Stansberry, 182 Ia. 908, 166 N. W. 359. The photographs in question merely gave the jury a better description than could have been given by words. They cannot be characterized as gruesome or inflammatory. The body of the dead woman lay on its back hiding the wound and blood. We cannot hold that the photographs had such a tendency to create unfair prejudice that it was the duty of the court to exclude them from the evidence."

In *Hicks* v. *State* (1938), 213 Ind. 277, 288, 11 N. E. (2d) 171, 12 N. E. (2d) 501, this court says:

"It is next insisted that error was committed in permitting Exhibit 7, which was a photograph of the head and hands of the deceased, to be introduced in evidence. The exhibit was properly identified as a photograph of the head of the deceased. We can conceive of no reason why the exhibit was not admissible. Appellant cites no authority to sustain his contention. *State* v. *Williams* (1923), 195 Iowa 785, 192 N. W. 901; *Lundy* v. *State* (1920), 204 Ala. 492, 85 So. 821."

The photographs admitted in the Williams case were much more likely to destroy "the mental poise" of the jury than those here in question, yet the Iowa Supreme Court affirmed a judgment which carried the death penalty.

In *Thrawley* v. *State* (1899), 153 Ind. 375, 55 N. E. 95, a skull was held to be properly admitted since the bullet holes therein were important in determining the attitudes and relative positions of the parties when the shot was fired. A skull is not a pretty object but its repulsive or gruesome character did not prevent its admission. No doubt the course of the bullet holes was described by witnesses but the demonstrative evi-

dence gave a more accurate picture. And this is true of the photographs we are considering.

Of the seventeen cases cited by appellant only three disclose reversible error committed in the admission of photographs. In *Vaughn* v. *State* (1939), 215 Ind. 142, 19 N. E. (2d) 239, a prison card with photograph was admitted. The prison number had been blocked out. We said (p. 145) :

> "It may well be doubted whether the jurors remained in ignorance of the fact that the photographs and card had to do with some criminal record of the defendant. It was not proper to prove that the defendant had a criminal record, and what may not be done directly may not be done by indirection or subterfuge."

In *Ligon* v. *Allen* (1914), 157 Ky. 101, 162 S. W. 536, X-ray photographs were held erroneously admitted because not properly authenticated.

In *Selleck* v. *Janesville* (1899), 104 Wis. 570, 80 N. W. 944, in a suit by a husband for loss of services and expenses in connection with the injury of his wife, it was held that distorted photographs of her injured foot were calculated to arouse sympathy for her pain and physical suffering which were not in issue.

One of the cases cited by appellant, *Davis* v. *Commonwealth* (1939), 279 Ky. 127, 130, 129 S. W. (2d) 1030, 1032, tends to support the view we take that the pictures were neither gruesome nor unfairly prejudicial. We quote:

> "The undertaker who prepared the body for burial described the wounds and testified that another person, with his assistance, had taken two photographs of the head. He identified them as accurate although some of the wounds were concealed by the hair. The photographs were introduced in evidence. The witness stated he was not experienced in taking photographs with a large camera and knew nothing about developing them.

The court admonished the jury that they were permitted only for the purpose of aiding in determining the nature and location of the wounds and that the jury should not to any extent let the pictures influence or prejudice them against the defendant. Other than questioning the sufficiency of the proof of accuracy, the appellant submits that the photographs were not necessary and should have been excluded because tending to distract the jury's attention from the main issues and to arouse their prejudice. See 22 C. J. 913. It was not necessary that the person who actually took the photographs should verify their accuracy. Central City v. Snodgrass, 234 Ky. 396, 28 S. W. (2d) 467. Perhaps the gruesome nature of the photographs of a dead body may sometimes tend to excite prejudice and may have been wholly unnecessary. But they are ordinarily admissible in evidence even without an admonition as to the effect to be given them. These photographs are not gruesome, and there was no error committed in admitting them."

Appellant was arrested May 27, 1940, on his father's farm in Kentucky, waived extradition and was taken to the Seymour Post of the Indiana State Police, arriving at 8:00 p. m. May 28th. That night he was held in Seymour City Jail. The next day in the State Police Barracks he wrote with pencil a confession in four pages. Two photographs show him seated at a table writing the confession. He was on the same day removed to Jeffersonville, where he was questioned by the prosecuting attorney in the presence of the sheriff. The questions and answers were taken down in shorthand by the prosecutor's stenographer, who transcribed them. This typewritten manuscript on May 30th was submitted to appellant, who made some minor corrections and then signed his name at the end. When the State sought to introduce the penciled confession and photographs objection was made and in the absence of the jury the trial judge heard all evidence offered by either the state or appel-

lant as to the circumstances under which the confession was made, and then permitted it and the photographs to go to the jury. Similar hearing was held, appellant testifying, when the typewritten questions and answers were offered and they too were read to the jury over his objection.

In presenting these alleged errors appellant insists that the confessions were not admissible because they, were not voluntary statements but were the product of threats and intimidations and made while he was in great fear. This was a question of fact for the trial judge who accorded appellant full hearing and by admitting the statement found that they were voluntarily made. His finding on conflicting evidence will not be disturbed on appeal. *Hicks* v. *State, supra; Hamilton* v. *State* (1934), 207 Ind. 97, 190 N. E. 870; *Mack* v. *State, supra.*

Appellant also insists that the second confession was not admissible because he was not prior to its taking "advised of his constitutional rights." Although he testified to the contrary, the stenographer, prosecutor and sheriff testified that he was told that he was not required to answer the questions, that his answers would be used against him, and there was testimony that the prosecutor told him he was entitled to the advice of an attorney. The trial court's finding on this evidence will not be disturbed. Besides there is ample authority for holding that the absence of such warning does not render a confession inadmissible. See 22 C. J. S., Criminal Law, § 822, p. 1441.

Appellant suggests that the penalty of death for first degree murder is forbidden by Article 1, Section 18, of the Constitution of Indiana, which provides that ██ the penal code shall be founded on principles of reformation and not vindictive justice. The law

is settled otherwise. *McCutcheon* v. *State* (1927), 199 Ind. 247, 155 N. E. 544.

The last error assigned is that the evidence is insufficient to sustain the verdict. The only argument on this point is that appellant was insane as disclosed by the testimony of a Louisville physician who qualified as an expert. The jury had ample evidence in conflict with his opinion. Witnesses who saw and talked with appellant during the day before the crime was committed and that night when he and his confederates were attempting to elude pursuit found nothing abnormal in his conversations. He himself remembered and recorded the events which occurred on the night of the crime, the details of which were fully corroborated by other evidence. There was some testimony, principally of relatives, that he had smoked marijuana cigarettes. The emotional effects of the drug were described as persisting for six to eight hours. But there was no evidence that he displayed any such effects on the night of the crime or that he had smoked any such cigarette within eleven or twelve hours of the murder. Three physicians appointed by the court testified that he was sane at the time of the trial and that there was nothing about his physical or mental condition indicating that he had been an addict of marijuana. Their opinions on hypothetical questions contradicted that of the Louisville physician. The evidence was sufficient to sustain the verdict.

It is unnecessary to prolong this opinion with the details of a sordid crime. Every error assigned has been carefully considered. We have read the entire record including all the instructions though no error is predicated thereon except as above stated. Finding no error the judgment is affirmed.

NOTE.—Reported in 37 N. E. (2d) 79.