CHARLES JACKSON RAY v. STATE OF INDIANA.

[No. 172A22. Filed January 24, 1973. Rehearing denied March 1, 1973. Transfer denied July 12, 1973.]

*Robert F. Craven,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Wesley T. Wilson,* Deputy Attorney General, for appellee.

LYBROOK, J.—Appellant (Ray) was indicted for First Degree Murder, tried by jury, found guilty of Manslaughter and sentenced to the Indiana State Prison for not less than two nor more than twenty-one years.

Appellant raises two issues: (1) That the admission into evidence of a rifle and shell casings violated appellant's con-

stitutional right to be free from unreasonable search and seizure and (2) That the admission of certain photographs into evidence prejudiced and inflamed the jury.

Before proceeding to a consideration of the issues, a narrative recitation of the facts is in order.

Duane Claxton, a Paoli police officer, testified that on June 24, 1969, at about 2:30 A.M., Ray approached him in a service station in Paoli. He further testified:

> "Well, he told me he shot at his wife and thought he had killed her and wanted to know what I was going to do and at this time we were outside of the station and I said I'm going to take you down and lock you up. He said, well, you better get the gun out of my car."

Officer Claxton testified he then went to Ray's car, removed a rifle from the back seat and some cartridges from the front seat and took Ray to jail.

The evidence further indicates that Ray was separated, but not divorced, from his estranged wife, Sadie L. Ray, the deceased.

On June 23, 1969, about 6:00 P.M., after Mrs. Ray had called her and requested that she meet her at a beauty shop in Orleans, Sharon (LaDuke) Sands walked to the shop with her four year old son. After she arrived, Ray came in and sat down and after Mrs. Ray's appointment was concluded, Ray asked the three of them to go with him to eat. They refused and instead went to Sharon's home in a car driven by Mrs. Ray. Appellant followed them to the LaDuke home, then to a nearby street carnival, then back to Sharon's home, and then to Mitchell and on to Salem, where they had a drink in a bar across from the Sheriff's office. Ray followed them into the bar and offered to buy them a drink. Mrs. Ray refused and he then ordered one for himself. While Mrs. Ray was playing the juke-box, he told Sharon that he was going to kill Mrs. Ray.

After leaving the tavern they drove around town, circling

the square several times, with the appellant following close behind. At a dairy bar, where they ordered food and drinks, appellant parked beside them and apparently attempted to converse with Mrs. Ray, who was unresponsive. Later while they were buying gasoline Ray pulled into the station and also purchased gas. Ray then followed them, eventually arriving at the Sheriff's office where he got out of his car and talked with Sharon. While Mrs. Ray was in the Sheriff's office, the appellant laughed, saying "the law won't do anything." The Sheriff came out with Mrs. Ray, and told her he could not make Ray leave her alone without a warrant and that she was illegally parked and would have to move her car. Mrs. Ray told the Sheriff that Ray was under a restraining order.

After driving around the square, the two women left for Orleans with the defendant still following close behind. After some distance, defendant blinked his lights as a signal for the women to stop and Mrs. Ray pulled to the side of the road. Ray pulled along side, rolled down his window and asked Mrs. Ray to come back to him. She said she would have to think about it, he said "no", and she pulled back on to the highway. Ray again pulled his car along side, accelerating to 35 miles per hour. Sharon testified she then heard a ringing in her ears, the car veered off the road to the left and Ray's car went on ahead and disappeared in the distance. Sharon got out of the car and found that she had been shot in the mouth, fracturing her jaw bone and knocking out four teeth. Mrs. Ray was lying with her head in the right front seat of the car, bleeding and apparently dead.

Sharon went to a nearby house for help and the Sheriff, Coroner and State Police Officers who arrived, found Mrs. Ray dead in the car.

Ray testified in his own behalf, stating that the gun in question, a 30-40 Krag rifle, had been placed in his convertible after he and his brother had fired it that morning. He further

stated that after following his wife and after she declined his last offer to drive her home, he started to pull around her and the boot for his convertible top began flying around. He reached down to pick up the gun, turn it around, and lay it on the back seat. At that time he heard a loud report and after he passed his wife's car, he saw it leave the road. He paused for a moment then drove on into Paoli where he talked with Officer Claxton.

Ray contends in his brief it was error to permit the introduction into evidence "of the rifle and shell casings, taken from his automobile by the arresting officer shortly after the occurrance [sic] in question", since they were obtained as a result of his conversation with Officer Claxton, before he was advised of his rights, pursuant to *Miranda* v. *Arizona* (1966), 384 U.S. 436.

The record before us does not contain the rifle or shell casings and does not show that they were ever offered in evidence, objected to or admitted into evidence. In the "Supplement to Transcript" which is in the nature of a stipulation between counsel, there is an indication that a meeting was held in the Judge's chambers during which the State indicated it "intended" to introduce the weapon, to which the defendant objected on the grounds that it was illegally obtained without a search warrant. The date of this meeting is not stated. Apparently, however, it preceded any offer of the weapon into evidence.

We are denied the opportunity of having a complete record before us because of a malfunction in the equipment used to record the trial. There is a dispute as to whether the rifle and shell casings were offered and admitted into evidence over defendant's objection.

However, assuming, *arguendo,* that they were, we hold that it was not erroneous.

Appellant depends heavily upon *Miranda, supra,* but this

land mark decision affords him no solace. *Miranda* applies only to the interrogation of persons *while in custody.* As the court said on page 478:

"The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

Defendant's purported objection to the effect that the exhibits were illegally obtained by an unlawful search also misses its target. The evidence showed that the rifle was in plain view upon the back seat of defendant's convertible. Some cartridges were also in plain view on the front seat. A search was not required to discover the presence of any of these articles.

Even in the absence of the "plain view doctrine" the officer acted properly in responding to appellant's invitation "Well, you better get the gun out of my car." In a similar case, *Muegel* v. *State* (1971), 257 Ind. 146, 272 N.E.2d 617, our Supreme Court held that the voluntary consent of the defendant legalized the warrantless search of an automobile, saying:

"As a rule a consent will be valid except where it was procured by fraud, duress, fear, intimidation, or where it is a mere submisison to the supremacy of the law. McAdams v. State (1948) 226 Ind. 403, 81 N.E.2d 671; Meno v. State (1925), 197 Ind. 16, 164 N.E. 93; Chandler v. State (1949), 226 Ind. 648, 83 N.E.2d 189. In the instant case there is absolutely no showing that the appellant was coerced into consenting to the search nor is there evident a mere submission to the supremacy of the law. As a matter of fact, appellant's own eloquent reply to the officers' request for permission to search the car, 'Look the Son of a Bitch over', very clearly dispells this contention."

Appellant's first contention is therefore not well taken.

Defendant's second issue concerns certain photographs admitted into evidence. Attached to the transcript in an envelope are what have been designated as State's Exhibits D, E, F, G and H. These consist of small color slides which were admitted into evidence over appellant's objections. Appellant maintains that the exhibits were inflammatory and that some of them were taken after the autopsy had been performed and the body moved.

It is extremely difficult to observe any detail in the above-mentioned slides without the use of a projector and screen. There is nothing in appellant's brief to indicate whether they were exhibited to the jury with or without the use of a projector.

This court has carefully examined each slide by the use of a projector. Each slide portrays the same automobile, which Exhibit D shows sitting sideways in the highway. E shows the glass shattered in both front windows and F and G show show the interior of the car from the right side with partial views of a woman's body. The feet are in the normal position under the steering wheel, the upper body is leaning to the right and the head is resting on the right side of the front seat. In each slide there is broken glass and what appears to be blood. H is another interior view from the right side of the car showing the front window glass broken out and what appears to be blood smears on the dash above the glove compartment.

Our examination convinces us that the above exhibits are neither inflammatory nor prejudicial.

Photographs of victims of crime are routinely admitted into evidence. The fact that the object portrayed in the pictures is the body of a dead person does not render them inadmissible. Neither are photographs showing wounds upon the body, inadmissible. *Hawkins* v. *State* (1941), 219 Ind. 116, 37 N.E.2d 79.

In each supplement to the transcript, appellant further ob-

jects to the above exhibits and particularly to Exhibit G on the grounds that: "an autopsy had already been done on the body which had been moved from the scene to the Washington County Hospital." Exhibit G clearly depicts the body of the deceased, fully clothed, in the front seat of the car. It will require more than the above assertion to convince us that the Coroner removed the body from the car, performed an autopsy and then returned the body to the car prior to the taking of this exhibit.

We conclude that appellant was not prejudiced by the admission of either the rifle, shell casings or the color slides admitted into evidence.

Finding no error in the record the judgment is affirmed.

Robertson, P.J. and Lowdermilk, J., concur.